Walter POGLIANI, Jacqueline Dunn, Stephen Dunn, Robert H. Boyle, Dimitri Sevastolpoulo, Ian Nitschke, and Stand Together Oppose Power Plant ("S.T.O.P.P."), Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, Defendant.

Athens Generating Company, L.P., Proposed Intervenor–Defendant.

No. 1:01–CV–0951.

United States District Court, N.D. New York.

Aug. 10, 2001.

Kenneth F. McCallion, Esq., (of counsel) McCallion & Associates, L.L.P., New York City, for Plaintiffs.

Joseph A. Pavone, United States Attorney, Diane J. Cagino, Esq., Assistant U.S. Attorney (of counsel) Albany, NY.

Ruth E. Leistensnider, Esq., Sherri Littlefield Moreno, Esq., (of Counsel) Nixon Peabody, L.L.P., Albany, NY, for Proposed Intervenor Athens Generating Company.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

## I. INTRODUCTION

On June 13, 2001, plaintiffs, concerned citizens and/or property owners in or near the Town of Athens, New York, filed a complaint seeking to permanently enjoin defendant, the United States Army Corps of Engineers ("the Army Corps"), from issuing a permit to proposed intervenor, Athens Generating Company ("Athens Generating"), for construction of a 1080 megawatt gas-fired power plant in Athens,

New York located in scenic Hudson River Valley. On the same date, plaintiff also filed an Order to Show Cause seeking a Temporary Restraining Order ("TRO"), pending a motion to enjoin defendant from issuing the aforementioned permit. By way of the TRO, plaintiffs sought an Order suspending both the permit (which was issued to Athens Generating on May 25, 2001) as well as pre-construction work on the power plant project which began on or about May 29, 2001.

Also on June 13, 2001, Athens Generating filed a motion to intervene in this action as a defendant via Order to Show Cause. On June 18, 2001, the Court conducted a hearing via telephone in connection with the parties' arguments on the TRO and deferred argument on the issue of intervention by Athens Generating pending receipt of papers by plaintiffs in opposition to said relief. The Court denied plaintiffs' TRO application orally at the conclusion of said telephone conference and by written Order dated June 28, 2001, but set the return date for plaintiffs' motion for a preliminary injunction for July 5, 2001.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On September 9, 1997, Athens Generating, an indirect wholly owned subsidiary of Pacific Gas & Electric Corporation ("PG&E"), commenced a state administrative proceeding by submitting a "pre-application" report, required to obtain a Certificate of Environmental Compatibility and Public Need ("certificate") for construction of a major electric generation facility,[1] to the New York State Board on Electric Generation Siting and the Environment ("Siting Board") under Article X of the New York Public Service Law ("Article X"). *See* N.Y. Pub. Serv. Law § 160 *et seq.*[2] The Siting Board and Athens Generating thereafter received public input concerning the report by way of public hearings, mail, telephone and the internet. The Siting Board and Athens Generating simultaneously engaged in a formal stipulation process which defined

1. The site of the proposed power plant is located approximately 2 miles west of the Village of Athens, in the Town of Athens, Greene County, New York. The plant would consist of three generation units, each with its own emission stack, a common cooling tower and an administrative building. Support facilities would include an intake-discharge facility, located three miles away on the Hudson River, which would supply water to the plant and return discharge water through a series of underground pipes. The plant will be powered by natural gas via an underground natural gas pipeline linked to the existing Iroquois Gas Pipeline Company system approximately 2000 feet north of the plant site. The plant will interconnect to the state's power grid at Niagara Mohawk Power Corporation's Leeds Substation, which is located on an adjacent parcel of land approximately 2,000 feet southeast of the proposed facility and use the New York State Bulk Transmission System to provide electric power through the New York Independent Systems Operator ("NYISO").

2. N.Y. Pub. Serv. Law Article X *(see,* L.1992, ch. 519, § 6, as amended by L.1999, ch. 636) provides for a comprehensive review of environmental and public interest impacts and the issuance of a certificate of environmental compatibility and public need as a precondition to the siting of a major electric generating facility, i.e., one with an output of 80,000 kilowatts or more, within the state of New York. *See* N.Y. Pub. Serv. Law §§ 160(2); 162. Ultimate authority for the prescribed review and issuance of a certificate is vested in the Siting Board, within New York's Department of Public Service, which consists of the Chair of the Department of Public Service, the Commissioner of Environmental Conservation, the Commissioner of Health, the Chair of the Energy Research and Development Authority, the Commissioner of Economic Development, and two *ad hoc* public members appointed by the Governor. *See* N.Y. Pub. Serv. Law § 160(4). The application submitted by Athens Generating was the first to propose a private, fully merchant, generating facility since enactment of Article X.

the appropriate "pre-application" environmental studies, which were completed by Athens Generating and its consultants. On August 28, 1998, Athens Generating filed its formal application for a certificate and the Siting Board Chair determined that the application was complete on October 22, 1998.

Administrative Law Judges from the New York State Department of Environmental Conservation ("DEC") and the New York State Department of Public Service ("DPS") were appointed to serve as Hearing Examiners. The Hearing Examiners conducted a prehearing conference and public statement hearings in November 1998 and following pre-filed testimony on all issues, held evidentiary hearings in March, April and June 1999. After a round of initial and reply briefs from various parties including some voluntary citizens' groups, the Hearing Examiners issued a 339–page recommended decision on September 3, 1999, suggesting that the Siting Board grant a certificate, subject to a number of specified terms and conditions.

Interested parties filed exceptions to the recommended decision to the Siting Board in addition to further briefs opposing the exceptions, in September and October 1999. On November 30, 1999, the Siting Board Chair requested supplemental information from Athens Generating concerning the plant's cooling technology, visual impacts, and related issues. On remand, the Hearing Examiners considered a number of issues, including the facility's proposed configuration if dry cooling technology were to be utilized. Responsive and rebuttal testimony was filed in December 1999 and January 2000. Additional hearings were held on January 26 and 27, 2000, and supplemental initial briefs and reply briefs were filed by the parties in February 2000.

The application for Article X certification filed by Athens Generating also included an application to DEC for a State Pollutant Discharge Elimination System (hereinafter "SPDES") permit for the withdrawal of water from the Hudson River for cooling purposes and the subsequent discharge of the unevaporated remainder. Based upon the determination by the Commissioner of DEC that water intake should be limited to 0.18 million gallons per day in order to satisfy "best technology available" requirements and avoid adverse impacts on Hudson River fish populations, the SPDES permit issued by DEC on June 12, 2000, effectively required that the plant utilize "dry" cooling technology as opposed to the "wet" or hybrid evaporative cooling system which was originally proposed and which would have required considerably more water.

In a 123–page opinion and order issued June 15, 2000, the Siting Board granted Athens Generating a certificate to construct the plant subject to certain conditions. As required by Article X, the Siting Board made several findings including: (1) a determination that the plant was selected pursuant to an approved procurement process and would serve the public interest (*see,* N.Y. Pub. Serv. Law §§ 168(2)(a)(ii); (e)); (2) adverse impacts upon the environment would be minimized and the facility would be compatible with public health and safety by virtue of the certificate terms set forth in the Siting Board approval order and the terms of permits issued by other agencies, including the DEC requirement concerning the use of dry cooling technology (*see,* N.Y. Pub. Serv. Law §§ 168(2)(c)(i), (ii)); (3) the plant's effect on the area's visual resources would be mitigated by lowering the height of the emission stack and cooling tower from 225 to 213 and ultimately to 180 feet, and using dry cooling to eliminate steam plumes (*see,* N.Y. Pub. Serv. Law § 168(2)(b)); and (4) certain waivers from the Town's zoning

ordinances deemed "unreasonably restrictive" in relation to Article X's goal of promoting development of additional major power sources while at the same time balancing environmental concerns were required (see, N.Y. Pub. Serv. Law § 168(2)(d)).

By petition dated July 14, 2000, Citizens for the Hudson Valley, Inc. (an organization in which plaintiff Sevastopoulo is a founder and a principal) along with other interested parties sought rehearing, which petition was denied by the Siting Board on August 10, 2000. On September 8, 2000, the aforementioned petitioners commenced an action pursuant to Article 78 of New York Civil Practice Law and Rules and Article X seeking nullification of the certificate arguing that the Siting Board's decision granting the Certificate was arbitrary and capricious and not supported by substantial evidence. Many of the named plaintiffs in this case as well as witnesses whom have submitted evidence in support of plaintiffs' application for injunctive relief are members or supporters of Citizens for the Hudson Valley. Residents and concerned citizens in the area to be potentially impacted by construction of the Athens Generating facility created this organization to ensure the preservation of the environmental, historical, agricultural and archaeological integrity and scenic beauty of the Hudson River Valley.

Essentially these citizens are concerned about the adverse environmental consequences of potential re-industrialization of the Hudson River area which, in their estimation, has just begun to recover from previous decades of unremitted environmental abuse. As a further matter, because the Hudson River and Valley are designated as National Heritage Areas due to their historic and economic significance, plaintiffs as well as Citizens for the Hudson Valley and its supporters believe the state and federal government need to be keenly aware of and sensitive to the impact of industrial construction in the area. Of particular concern to plaintiffs is the potential degradation of heretofore undisturbed vistas or "viewsheds" from historical homes such as the Olana Mansion and State Historic Site [3] and other archaeological landmarks of state and national importance in the vicinity of the proposed power plant.

By order and decision dated April 12, 2001, the New York State Supreme Court, Appellate Division, Third Department unanimously upheld the Siting Board's issuance of the certificate in all respects. See Citizens for the Hudson Valley v. N.Y. State Bd. on Elec. Generation Siting and the Env't, 281 A.D.2d 89, 723 N.Y.S.2d 532 (3d Dep't 2001). In its decision, the court rejected the contention by petitioners that the Siting Board erred in its determination that Athens Generating was not required to describe and evaluate alternative sites pursuant to N.Y. Pub. Serv. Law § 164(1)(b). To the contrary, the court concluded that the Siting Board rationally determined that a private applicant, such as Athens Generating, lacking the power of eminent domain, could not be compelled to present alternative sites that it neither owned nor had an option to purchase.[4]

---

**3.** Olana was the home and studio of nineteenth century painter Frederick Edwin Church who was the "prize" student of Thomas Cole, the founder of the Hudson River School of American landscape painting. The panoramic views from Church's hilltop estate were the inspiration for some of his most important paintings. Olana, included on the National and State Registries of Historic Places, is located in Greenport, New York, across the Hudson River and less than four miles from the project site.

**4.** New York's State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law § 8–0101 et seq., which does require investigation and elimination of alternatives for siting of industrial facilities likely to have

This principle notwithstanding, the Siting Board had allowed petitioners in the Article X administrative proceeding to present evidence of alternative sites concerning whether the proposed power plant was in the "public interest." The Third Department determined that the record supported the Siting Board's conclusion that the alternatives offered by petitioners had "problems of their own" and that "[t]here [had] been no showing that there [was] an available, preferable site that should be developed instead of the site proposed by [Athens Generating]." *Citizens for the Hudson Valley*, 723 N.Y.S.2d at 538.

The court also found "substantial evidence in the record to support the Siting Board's conclusion that, considering the environmental impacts, the construction and operation of the [proposed] facility [would be] in the public interest" pursuant to Article X. *Id.* (citing N.Y. Pub. Serv. Law § 168(2)(e)). The court further found:

> Most notably, the record does not support petitioner's contention that construction of the facility will unreasonably impact the viewshed from Olana, the renowned estate of Frederic Church, leader of what was to become known as the Hudson River School of landscape painting. As noted in the Hearing Examiners' decision, "[n]o issue has received more attention in this proceeding than the visual impact of the proposed generating plant," and the Hearing Examiners devoted more than 80 pages of their voluminous decision to that topic,

with 26 pages dedicated to visual impacts on Olana alone.

We would first note that the record belies petitioner's representation that the proposed facility is "directly across the Hudson River from Olana." To the contrary, the facility is situated on the opposite side of the river, approximately 3.1 miles north of Olana and two miles inland. The distinction is significant because expert testimony indicated, and the Siting Board found, that the proposed facility would be located in Olana's north/northwest viewshed. Views in that direction "offer a basically flat horizon in the distance, and encompass a section of the Hudson River Valley in the foreground which includes topographic and land use features that are not unusual or extraordinary." The renowned views to the southwest are unaffected.

[Athens Generating] commissioned a visual impact study of the proposed facility which, consistent with the Visual Resources Assessment Procedure issued by the Army Corps of Engineers, was designed to assess the potential visibility of the proposed energy facility and its ancillary structures by comparing the differences in the landscape with and without the above-ground components of the project in place. Throughout the review, the proposed height of the three combustion turbine emission stacks was reduced from 225 to 213 and, ultimately, to 180 feet. One hundred and eighty-foot stacks not only eliminated the need

---

a significant impact on the environment is applicable to Article X proceedings by virtue of N.Y. Pub. Serv. Law § 164(1)(b). However, DEC regulations passed pursuant to this provision specify that "[s]ite alternatives may be limited to parcels owned by, or under option to, a private project sponsor." 6 N.Y.C.R.R. § 617.9(b)(5)(v); *see also*, 16 N.Y.C.R.R. § 1001.2(d)(2) ("For a private ap-

plicant: . . . site alternatives may be limited to parcels owned by, or under option to, such applicant"); *Matter of Schodack Concerned Citizens v. Town Bd. of Town of Schodack*, 148 A.D.2d 130, 135, 544 N.Y.S.2d 49 (3d Dep't 1989); *Horn v. Int'l Bus. Mach. Corp.*, 110 A.D.2d 87, 95–96, 493 N.Y.S.2d 184 (2d Dep't 1985).

for obtrusive aviation warning lights, but substantially reduced the degree to which the facility could be seen from distant vistas. In addition, the ultimate decision to utilize dry cooling technology not only minimized impacts on the Hudson River but provided the further benefit of essentially eliminating visible stack plumes, a very significant mitigation measure in light of the focus groups' conclusion that stack plumes represented the most significant visual impact of the facility. Based upon the voluminous record before it, the Siting Board ultimately concluded that "the probable visual impact of the proposed facility would be slight, and that such impact would not be significantly adverse to the interests and areas of concern identified in [Article X]." In our view, that conclusion has abundant support in the record. *Id.* at 538–39.

Finally, the court found that the administrative record supported the Siting Board's determination that the proposed plant would "contribute to competition, thereby lowering electricity prices, displace less efficient plants, provide a reliable source of electricity at a time when there are projected energy shortfalls and relieve transmission constraints." *Id.* at 539.[5]

Concurrent with the state Article X proceeding, Athens Generating had also submitted an application to the Army Corps on February 24, 1999, for a permit to undertake certain construction activities in furtherance of building the plant and its support facilities in Army Corps jurisdictional areas. Specifically, Athens Generating sought a federal permit to: (1) install the water intake and discharge heads and piping in the Hudson River; (2) cross several stream or "wetland" areas and install certain limited portions of the water pipelines in wetland areas; and (3) construct limited portions of the plant—an access road and a portion of one cooling tower—in waters of the United States, including wetlands. On May 14, 1999, Athens Generating submitted a supplement to its Army Corps application, and on July 20, 1999, the application was deemed complete for processing.

The Army Corps coordinated its review of the proposed project with other federal agencies having jurisdiction and/or significant interest in the subject permit including: (1) the National Marine Fisheries Service ("NMFS") which conducted an Endangered Species Act analysis of the potential impact of the plant's proposed water intake design on short-nosed sturgeon as well as a Fish and Wildlife Coordination Act analysis concerning project modifications necessary to protect other fish and the "diverse macrobenthic community" of the Hudson River; (2) the United States

---

**5.** In connection with this determination, the court noted:

> Evidence also established that, as a modern natural gas fueled facility, certain noxious gas levels would be reduced and the use of dry cooling technology would result in fewer fish kills because production will be displaced from other Hudson River power plants that draw more water and, therefore, kill more fish. Petitioner's speculation that [Athens Generating] intends to market its electricity in New England lacks support in the record and, at most, raised a credibility issue that the Siting Board was

> entitled to resolve in favor of [Athens Generating] [citation omitted]. Further, the record indicates that the plant was required as a condition of approval to submit to the [NYISO] for the dispatch of electricity. Thus, even if the plant's electricity were to be sold outside the State, transmission of the electricity through NYISO would commit generators to minimize costs and maintain reliability and the overall amount of electricity produced in the State would be increased, thereby resulting in lower electricity prices.

> *Id.* 723 N.Y.S.2d at 539.

Fish and Wildlife Service ("FWS") which conducted an analysis of the impact of the proposed project on wetland and stream habitats during and after construction of water and gas lines; the United States Environmental Protection Agency ("EPA") which reviewed potential effects of the project on wetland areas, anticipated effects of discharging wastewater into the Hudson River and the possibility of significant erosion following excavation of sediment from river bottom. Athens Generating responded in writing to each of the concerns raised by the above agencies which ultimately agreed that the permit could be issued upon construction and operation conditions, modification of the project and/or construction and implementation of protective and/or restorative measures to ascertain minimal adverse environmental impacts.

On August 4, 1999, the Army Corps issued a public notice describing the proposed project and requesting public comment. On September 27, 1999, the Army Corps published a supplemental public notice which extended the comment period to November 17, 1999, and announced that a public hearing would be held on November 3, 1999. On November 3, 1999, the Army Corps held two sessions of public hearings attended by approximately 400 interested persons. In response to comments made during the public hearing and additional written comments which had been submitted by the public, Athens Generating submitted a two-volume "Response to Comments" to the Army Corps on January 28, 2000. Between June and December 2000, the Army Corps made several oral and written requests of Athens Generating for additional information on various issues of concern to the agency and the public.

The Army Corps also conducted a review of the potential impacts of the power plant project on historic properties in conjunction with the New York State Historic Preservation Office ("SHPO") as well as the Advisory Council on Historic Preservation ("ACHP") which administers the National Register of Historic Places ("NRHP"). Upon review of the original proposal submitted by Athens Generating which included hybrid cooling technology for the plant, SHPO determined that the project would have an adverse effect on the Olana State Historic Site and several other historic resources located in the vicinity of the project which were listed or eligible for listing on the State and National Registers of Historic Places. However, when Athens Generating modified its proposal to use dry cooling technology, thus eliminating or nearly eliminating potential for formation of visible steam plumes, SHPO revised its findings and concluded, in a letter to the Army Corps dated December 28, 2000, that the project revisions, along with the conditions contained in the Article X certificate issued to Athens Generating, "have resolved, to SHPO's satisfaction, the effects that initially caused SHPO to have concerns about the facility."

Nevertheless, the Army Corps subsequently issued a letter to ACHP which determined, pursuant to Section 106 of the National Historic Preservation Act ("NHPA"), that the Project would have an adverse visual effect on historic properties, including Olana and other historic residences. As a result of this adverse effect determination, the Army Corps invited ACHP, along with more than twenty other interested parties, including all but two of the plaintiffs herein, to participate in NHPA Section 106 review proceedings concerning the effect of the power plant project on historic properties. The Army Corps conducted the Section 106 review during late March to mid-May 2001. During the consulting process, the Army Corps gave interested parties the opportunity to submit written comments on three occasions, attend two meetings and provide oral comments, and review and com-

ment on a draft Memorandum of Agreement ("MOA") between the Army Corps and Athens Generating concerning issuance of the requested permit.

In response to comments submitted by the consulting parties in the course of the Section 106 review, Athens Generating submitted two response documents to address various concerns. After consideration of final comments from the consulting parties, the Army Corps, SHPO, ACHP and Athens Generating executed a final MOA on May 16, 2001, which included agreements and conditions for the permit to avoid, mitigate and/or minimize the potential adverse effects of the power plant project on historic properties. Parties to the MOA also agreed and acknowledged that the Army Corps had thus fulfilled its obligations pursuant to Section 106 of NHPA and its implementing regulations.

On May 25, 2001, the Army Corps also filed a 107–page document entitled "Memorandum for Record" ("MFR") which detailed its "statement of findings and environmental assessment" ("EA") for the permit sought by Athens Generating. According to the Army Corps, the MFR was prepared "in accordance with the policies and procedures . . . for implementation of the National Environmental Policy Act ["NEPA"] which requires an agency to

prepare an environmental impact statement ("EIS") when permitting or engaging in a major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).[6] The MFR sets forth in great detail the analysis conducted by the Army Corps of the various environmental, health and safety, historical and aesthetic concerns raised by the public, interested organizations and agencies concerning the power plant project. In addition, the MFR outlined the Army Corps' efforts to coordinate environmental and historic review of the proposed project with other federal and state agencies having jurisdiction or significant interest in the areas to be affected by the plant.

To wit, the MFR recounted the state review process for the proposed Athens Generating facility which resulted in the Siting Board's issuance of a Certificate of Environmental Compatibility and Public Need and DEC's issuance of both SPDES and air pollution control permits. The MFR also described the original project proposal as well as the substantial modifications made in the course of the state and federal review processes to account for potential environmental and historical impacts identified by interested parties, state and federal agencies, the public, the Siting

---

**6.** Whether a particular proposed action significantly affects the environment, thus necessitating the preparation of an EIS, is a threshold question. The Council on Environmental Quality ("CEQ"), created under NEPA, is responsible for promulgating regulations that supplement NEPA's statutory requirements. The CEQ regulations provide that if the agency is uncertain whether the impacts rise to the level of a major federal action requiring an EIS, the agency must prepare an environmental assessment. 40 C.F.R. §§ 1501.3, 1501.4, 1508.9. An EA is "a concise document that briefly discusses the relevant issues and either reaches a conclusion that preparation of [an] EIS is necessary or concludes with a finding of no significant impact, in

which case preparation of an EIS is unnecessary." *Sierra Club v. Espy,* 38 F.3d 792, 796 (5th Cir.1994). The EA serves to: (1) briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; (2) aid an agency's compliance with the Act when no environmental impact statement is necessary; (3) facilitate preparation of a statement when one is necessary; and "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

Board and the Army Corps. In a fifty-page section entitled "Analysis of Public Comments," the Army Corps set forth each and every concern or issue raised during "public coordination" of its review process. Following each public comment, the Army Corps set forth the response of Athens Generating as well as its own analysis of the issue based on review by the Siting Board, the various involved state agencies, federal agencies having jurisdiction on the issue and its own conclusions. These public concerns included: 1) the need for the project in the first instance;[7] 2) the need to prepare an EIS in light of the State's failure to have required Athens Generating to do so;[8] 3) the failure to consider alternative "brownfield" sites already marred by industry or pollution;[9]

4) the use of "hybrid" cooling as opposed to "dry" cooling which represents the best available technology to minimize environmental impact;[10] 5) the potential impact of project construction and operation on "fishery resources" such as shad, striped bass, white perch, alewife and the endangered shortnose sturgeon due to dredging of the river bottom and discharge of heated and treated wastewater back into the river;[11] 6) decreased waterway capacity due to use of Hudson River water to cool the plant; 7) the potential for a decrease in water quality of nearby Sleepy Hollow Lakes due to air pollution generated by the proposed plant, and storm runoff affected by discharge of chemicals into the Hudson River and groundwater near the facility;[12] 8) the loss of wetlands, particu-

7. The Army Corps concluded that the State Energy Plan for New York, its governor, the Public Service Commission and NYISO unanimously agreed that the additional capacity which could be generated by the proposed facility as well as the facility itself were needed to "maintain the reliability" of New York's electric supply.

8. In connection with this issue, the Army Corps concluded that both the state and federal administrative review processes have allowed sufficient opportunity for public involvement and input regarding the potential impacts of the proposed project. Indeed, the Army Corps stated that "the need for an EIS is a primary evaluation factor in [its] regulatory review process."

9. While the Army Corps agreed that alternative sites "should be explored to determine if the proposed project represents the least environmentally damaging practicable alternative," the agency reviewed the "no action alternative" of not building the plant at all, alternative siting analysis completed during the Article X proceeding, public comments it received regarding the issue—including five "brownfield" sites discussed by Dr. Robert Henshaw, who represented Citizens for the Hudson Valley, during the Article X administrative hearing—and conducted its own analysis of alternative sites. Because of the proximity of the Athens site to fuel and power transmission infrastructure as well as water

supply, the agency concluded that the proposed Athens site was the "only practicable alternative that meets the Project Purpose."

10. The Army Corps agreed that dry cooling was the best available technology and that Athens Generating had already modified its proposal to include it.

11. In consultation with DEC, NMFS, and the New York Department of State ("DOS"), the Army Corps concluded that the modification of the project to utilize dry cooling, plans to minimize turbidity during construction using port-a-dams and silt curtains and limits on the amount and rate of discharges into the river as well as water temperature would minimize or eliminate any adverse impacts to fish, water quality and quantity.

12. The Army Corps concluded after review of DEC's position on this issue that modification of the project as well as stormwater management plans, controls and conditions of Athens Generating's SPDES and Army Corps permits would significantly reduce or eliminate water or air contamination at Sleepy Hollow Lake. In addition, to further minimize the risk of adverse impact, Athens Generating had agreed to pay the Town of Sleepy Hollow to develop and implement a water quality monitoring program and to enhance the quality of the lake.

larly in the area of Leeds Flats, the cumulative effect of which could result in major impairment of overall wetland resources;[13] 9) the possibility that blasting and other construction activities might open bedrock fissures, impact groundwater resources and affect the constructural integrity of existing nearby structures such as the dam that maintains Sleepy Hollow Lake;[14] 10) the likelihood of significant adverse impact to historic properties and archeological resources located within a five-mile radius of the project site;[15] 11) concerns that the project would not have a positive economic effect on the area and that the potential for adverse historical and aesthetic impacts would reduce tourism in Columbia and Greene counties;[16] 12) allegations that the project, regardless of the modification to dry cooling, does not comply with federal coastal management policies established by DOS and is inconsistent with the proposed Local Waterfront Revitalization Program being developed by the Village of Athens;[17] 13) concern that the Town of Athens had insufficient

13. Athens Generating had proposed to siting, design and appropriate construction methods to "avoid dredging and filling impacts, and to minimize the extent and significance of unavoidable impacts." The Army Corps noted that to install the proposed electric transmission line, only 0.01 acre of wetlands would be permanently impacted by construction of tower footings. Athens Generating also agreed to create 1.6 acres of new wetlands and enhance and restore 3.4 acres of degraded wetlands in Leeds Flats. The Army Corps concluded that these measures would ensure there was no net loss of wetlands. The agency also stated it would attach special conditions to any permit it issued to ensure that: 1) proposed temporary impacts to wetlands during construction of the access road and transmission structures were restored; 2) the impacts associated with the project were limited to authorized areas; 3) final mitigation are developed and approved in a timely manner; and 4) work areas and wetland mitigation areas are monitored for successful recovery.

14. The Army Corps examined the data submitted by Athens Generating along with technical reports and testimony prepared regarding this issue and determined that impacts associated with any blasting activities would be minimal and, in any event, limited to or very near the project site. As a further matter, the Army Corps stated that an appropriate plan would be developed "to monitor groundwater and consider corrective measures should any excessive groundwater level fluctuations be observed."

15. The Army Corps addressed and accounted for these concerns by reviewing the results of the extensive visual impact analysis prepared by Athens Generating in conjunction with SHPO, DPS and other interested parties as well as conducting a full-fledged Section 106 review pursuant to NHPA as referenced above. The agency thereafter noted that Athens Generating had agreed to modify its proposal to include dry cooling and adopt design measures such as lighting, landscaping, tree protection and facility color, to minimize visual impacts. Thus, the Army Corps concluded that although the project would have some adverse effects on cultural resources, the impacts would be slight.

16. The Army Corps agreed with the evidence submitted by Athens Generating that the project would provide economic benefits through job creation, tax revenues, use of local businesses by employees and the commitment of the company to provide energy locally at wholesale prices. Furthermore, because the Army Corps determined via its visual impact analysis and the Section 106 review process that negative aesthetic impact of the project would not be significant, it concluded that tourism and property values would be minimal. Furthermore, Athens Generating agreed to fund landscaping to screen views of the facility from affected properties and provide funds to enhance properties in the Town and Village of Athens in accordance with its draft Local Waterfront Revitalization Program.

17. The Army Corps noted that since DOS, the agency responsible for administering the federal Coastal Management Program, determined that modification to dry cooling technology rendered the project "consistent" with the state's coastal management efforts, this concern was adequately addressed.

emergency equipment and personnel to handle an explosion or other crisis at the plant and that plant operation would be largely unsupervised thus raising safety questions;[18] 14) criticism of the use by Athens Generating of meteorological data from the Albany Airport, located 35 miles north of the proposed plant site, in its air dispersion modeling which rendered its air quality analysis inaccurate;[19] 15) criticism of the use of "typical projections" when assessing the likelihood of unsightly steam plumes emerging from cooling towers and stacks at the plant rather than "worst-cases scenarios;"[20] 16) given the location of the proposed facility near the Hudson River which has already been contaminated by decades of pollution, chemicals, nitrogen exides, ammonia, carbon dioxide and numerous volatile organic compounds produced and discharged into the water and air via the electric generation process pose unacceptable health risks, particularly for children attending the nearby school;[21] 17) concern that emissions from cooling towers, including aerosols, will increase local fogging and icing of nearby roads;[22] 18) the suggestion that pooling of contaminated water processed at the facility would create a breeding ground for Legionalla, the pathogen for Legionnaires Disease;[23] and finally 19) increased noise and traffic in the community surrounding the proposed facility during its construction and eventual operation.[24]

**18.** The Army Corps noted that Athens Generating had consulted with appropriate local officials in the Town of Athens who determined the Town could adequately respond to any emergency situation at the facility with additional training which Athens Generating had agreed and was required to provide as a condition of the Article X certificate. With respect to the latter issue, the Army Corps stated that each state and federal agency, including the Army Corps, has authority to determine compliance with permits, statutes and regulations as well as authority to enforce non-compliant activities should they occur.

**19.** The Army Corps noted that DEC, the agency responsible for determining the proposed project's compliance with federal and state air quality standards, determined that use of meteorological data from the Albany airport was adequate to assess air quality and in accordance with EPA guidelines.

**20.** The Army Corps concluded that based on the use of dry cooling technology, stack plumes were not an expected occurrence at the plant. Furthermore, to the extent that such plumes developed, Athens Generating would create a monitoring program and employ corrective measures to eliminate any visible plumes.

**21.** The Army Corps reviewed the evidence submitted by Athens Generating on this subject, the available technical information, the findings of the state authorities responsible for authorizing the proposed emissions, including air and water pollution control permits issued by DEC, and determined that the health and safety concerns for residents in or near the project site had been adequately addressed.

**22.** Given the modification to dry cooling technology and use of less water, the Army Corps concluded emissions would be reduced which would, in turn, reduce the potential for increased fogging and icing. Because appropriate meteorological data was used by Athens Generating in preparing its Seasonal and Annual Cooling Tower Impacts model, the Army Corps determined that any increased impacts to safety regarding the emissions issue was not significant.

**23.** After noting that the state and federal authorities responsible for determining health risks and compliance with air quality standards had concluded that an increased potential for exposure to Legionalla was not significant, the Army Corps did likewise, although Athens Generating agreed to follow applicable guidelines to further minimize any such risk.

**24.** The Army Corps noted that the Article X certificate issued by the Siting Board was conditioned on ensuring that the existing roadway system in and near the Town of Athens was sufficient for expected increases in traffic and that any unavoidable traffic impacts would be minimized. As a further matter, the Army Corps stated that all of the information submitted concerning the issue of noise pollution demonstrated that impacts as-

In conclusion, the MFR announced that in the estimation of the Army Corps, issuing the requested permit to Athens Generating would "not significantly affect the quality of the human environment either in an adverse or beneficial manner." Thus, the Army Corps concluded that preparation of an EIS was unnecessary. Based thereupon, on May 25, 2001, following execution of the MOA and on the same day it filed the MFR, the Army Corps issued a permit to Athens Generating which allowed the company to commence construction work on the power plant project. Athens Generating began pre-construction activities at the site on May 29, 2001, and to the Court's knowledge, continues this work to date.

## III. DISCUSSION

### A. *Plaintiffs' Motion for Preliminary Injunction*

A party seeking a preliminary injunction "must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *accord Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989).

### 1. *Irreparable Harm*

■ Turning to the first element, the Court finds that plaintiffs have not sufficiently demonstrated that they or the environmental, historical and aesthetic concerns they purport to represent will suffer irreparable harm should construction of the power plant by Athens Generating begin and/or continue in advance of preparation of an EIS by the Army Corps.

Plaintiffs have submitted voluminous documentation in support of their claim that various environmental and historical interests in the area where the power plant is to be built will be adversely affected permanently by continuation of construction during the pendency of the present litigation. To wit, attached to plaintiffs' original moving papers herein are the following evidentiary exhibits: 1) a copy of Executive Order 13061 issued by then President William J. Clinton in September 1997 concerning the "American Heritage Rivers" initiative whereby rivers of historic, cultural, economic, scenic or recreational importance may be designated for particular focus by the federal government on natural resource and environmental protection, economic revitalization and historic and cultural preservation; 2) a copy of the description of the Hudson River and the revitalization efforts underway there pursuant to the "American Heritage Rivers" program posted on EPA's official public access website;[25] 3) a copy of a newspaper article from the Poughkeepsie Journal "Online Edition" dated June 3, 2001, describing how New York's "new 'fast track' mechanism for approving proposed power plants" via the Siting Board took four years to issue a permit to Athens Generating for the project at issue herein and how "New York

---

sociated with noise would be minimal. Nevertheless the Army Corps resolved to condition and monitor any permit on requiring Athens Generating to develop and operate the facility in furtherance of minimizing noise impacts.

**25.** EPA's website states that: "[t]he Hudson River is one of America's most important

commercial and recreational waterways and is recognized as an estuary of national importance ... [The] Estuary extends for 154 miles of the river's 315–mile length. It is a unique natural resource, home to over 206 species of fish. The [Hudson River] valley is an important flyway for migratory birds and is home to many endangered and threatened species such as bald eagles and heartleaf plantain."

officials never sought serious consideration of any location for the plant other than the one the builder wanted;" 4) an affidavit from Robert E. Henshaw, a former Environmental Analyst with DEC who has a doctorate in comparative environmental physiology, which sets forth alleged deficiencies in the Article X review process conducted by the Siting Board as compared to what would have been required if the Athens Generating project had been subject to review under SEQRA;[26] 5) an affidavit from Roger Downs, a "graduate student in the environmental program at Bard College and a Hudson River fisherman" who opines that the construction of the power plant will involve the destruction of mature forest habitat and the degradation of environmentally sensitive wetlands in addition to disruption of an area of the Hudson River which serves as a spawning ground for American shad;[27] 6) an affidavit from Jacqueline Dunn, one of the named plaintiffs, who owns a house and property directly adjacent to the site of the proposed pumping station for the power plant;[28] 7) an affidavit from author and journalist

**26.** Dr. Henshaw testified during the Article X review process on behalf of Citizens for the Hudson Valley in opposition to permitting of the proposed Athens Generating plant. He also authored an article entitled "Taking a 'Hard Look' at Article X: Its Failure to Provide Complete Environmental Review" which criticized Article X as a so-called "one-stop power plant siting law" because it does not, in Dr. Henshaw's estimation, adequately balance environmental and economic issues nor does it comply with the EIS requirement in SEQRA or NEPA. Without stating the basis of his personal or expert knowledge on these issues in his affidavit, Dr. Henshaw further discusses *inter alia:* 1) the recovery of existing abandoned power plants and "brownfields" as an alternative to siting the Athens Generating plant in an undeveloped "greenfield;" 2) the present and future electric generating capacity needs of New York State as well as constraints likely to be faced on transmission of electrical power from the Athens Generating plant to downstate New York; 3) the scenic, cultural and economic history of the Hudson River along with the history of revitalization efforts in the river and valley areas; 4) the degradation of the Hudson River's aesthetic "viewshed" from the Town of Athens, the City of Hudson and surrounding areas including the Olana Mansion based on the massive physical presence of the proposed plant and its anticipated steam plumes against the "discordant" topography of the Hudson River Valley; and 5) finally, the possibility of using alternative water sources or technology to cool the plant and thus avoid the requirement of siting the plant near the Hudson River in the first place.

**27.** Mr. Downs purports to have "expert" knowledge concerning the habitats and spawning activities of various fish species as well the expected increase in fish morbidity from being drawn into the proposed water intake pipe for the plant. Mr. Downs also avers that "in the vicinity" of the intake/discharge pipes there are three species of plants—heartleaf plantain, beggars tick and spongy arrowhead—on the otherwise unidentified "Threatened Species List" but he does not state if or how these plant species will be affected by plant construction or operation. Mr. Downs states "upon information and belief" that no comprehensive EIS has addressed what he estimates will be adverse visual impact of the plant on two prehistoric sites, Mine Hill and West Athens Hill, which the National Park Service has considered designating as "National Landmarks." Finally, Mr. Downs suggests, as did Dr. Henshaw, that Athens Generating should be required to explore the possibility of using a "cooling pond, municipal water or other sources" to cool the plant rather than Hudson River water. Nowhere in Mr. Downs' affidavit does he state the basis for his personal knowledge of the adverse environmental and visual effects he anticipates from construction of the power plant project or his expertise in power plant cooling alternatives and technology.

**28.** Ms. Dunn's affidavit, like the others referenced above, is replete with factual, scientific and historical averments based on "information and belief" or something other than personal knowledge. For example, Ms. Dunn avers that for the past several years, she and her husband have "become very informed on the nature and history of the River and the

Robert Boyle who has "been actively involved in protecting the environmental resources of the Hudson River since 1963;"[29] 8) an affidavit from Walter Pogliani, another named plaintiff in this action who owns the historic O'Grady House located within 3000 feet of the proposed plant site;[30] 9) an affidavit from Carrie Feder, a "lifelong resident of New York State" and a twelve-year resident and property owner in Athens;[31] 10) an affidavit from Ian Nitschke, a named plaintiff

area," and that the proposed siting of the power plant "is in a scenic area of both statewide and national significance." Ms. Dunn also states that situated on her property which is directly across the river from the Olana Mansion, are the remains of two icehouses built in the 1800's. She further questions the use of river water to cool the plant and suggests that alternatives such as a cooling pond were never "seriously considered." Ms. Dunn states that the proposed pumping station will be built in the cove next to where she and her grandchildren play and skip stones and where "[she is] told" fishing boats seek out "some of the best striped bass." Ms. Dunn also avers that the pumping station site is located "within a 6.75 mile stretch of the Hudson River containing four designated habitats which house important spawning grounds for many fish, including striped bass and shad." Finally, Ms. Dunn describes a PG&E power plant which she and her husband visited in Rhode Island which included a massive pumping station that "could be clearly heard from outside." According to Ms. Dunn, a pumping station of that nature built near her property "would be completely out of scale to the character of the homes and buildings" in and around Athens. Notwithstanding her objection to the use of a similar pumping station for the Athens Generating project, however, Ms. Dunn did note that the Rhode Island plant was cooled via a 7-acre lined pond during summer months when the adjacent river was too low to provide a reliable source of water. Attached to her affidavit is marketing literature for Ocean State Power which operates the Rhode Island plant as well as a magazine article written about the facility.

29. Mr. Boyle wrote a book entitled *The Hudson River. A Natural and Unnatural History* in which he "took note" of Thomas Cole, the founder of the Hudson River School of American art. Mr. Boyle does not specifically state that either Frederic Church or the Olana Mansion where he lived and worked were discussed in his book but he does state with no reference to his personal knowledge of these facts that "[w]hen unable to paint because of arthritis, Church busied himself making his estate into a work of landscape art" and that "[m]any visitors to Olana still rejoice in the magnificent views from Church's well-planned roads." Indeed, Mr. Boyle notes that if "recent vegetation blocking the views from [Church's] studio window were removed and the view was restored to its original condition, it would readily permit visitors to see exactly where the planned intrusive power plant would befoul the vista." In his affidavit, Mr. Boyle also details his efforts in founding the Hudson River Fisherman's Association "which led to the first prosecutions ever of industrial polluters in the United States," as well as the "Robert H. Boyle Advocacy Center" at Pace University School of Law which has acted as attorney for the "Riverkeeper" organization. Although Mr. Boyle does not claim to have a law degree, his "active" status in fighting industrialization and pollution in the Hudson River Valley area have apparently led him to conclude that the Second Circuit's decision in *Scenic Hudson Pres. Conference v. Fed. Power Comm'n*, 354 F.2d 608 (2d Cir.1965), "marked the birth of modern environmental law." Furthermore, Mr. Boyle opines that construction of the Athens power plant would unquestionably violate NEPA which requires an EIS to be prepared for every large project requiring approval or funding by a federal agency and public notice regarding proposed permitting to be published.

30. Mr. Pogliani states that although he submitted extensive comments and suggestions regarding alternative siting for the project during the NHPA Section 106 review proceedings, he did not receive a response nor were any of his concerns adopted by the Army Corps.

31. Ms. Feder and her husband own two historic houses in Athens, both of which are listed on the National and State Historical Registers. She holds a B.A. in studio art from Brown University where she concentrated in American Art History and American

and resident of Claverack, New York, located 6.7 miles across the Hudson River from the site of the proposed Athens Generating plant, who has a Ph.D. in theoretical physics and is presently employed as a Utility Analyst for the New York DPS;[32] 11) an affidavit from Peter Jung, a member of the Board of Trustees of the Olana Partnership, who owns an art gallery in Hudson, New York, directly across the river from the site of the proposed plant;[33] and finally 12) an affidavit from Dimitri Sevastopoulo, a named plaintiff in this action and owner of a house and property on Mt. Merino Road in Hudson, New York.[34]

Studies. Ms. Feder states that she has worked in the field of "design, reconstruction and historic preservation" for the last eighteen years in which time she has "personally observed and participated in the revitalization of the Hudson River Valley and its environment." With scarce, if any, references to her personal knowledge, Ms. Feder's affidavit details many historic, archeological, architectural, industrial and economic facts, events and interests in Athens and the surrounding Hudson River Valley area which, in her estimation, make it particularly ill-suited for further industrialization by the proposed power plant. Ms. Feder also makes conclusory allegations that purchase of and investment in property and small businesses in the Athens area have been and will continue to be negatively affected by construction of the power plant.

**32.** Mr. Nitschke has been "an active member of local, state and national historic preservation organizations since at least 1976" and founded Clover Reach, an organization which has received grants and awards for its work in preserving and enhancing Claverack's heritage, charm and vitality. Mr. Nitschke avers that he was an "active party" in the Article X siting case and "filed extensive testimony and briefs concerning historic preservation issues in that flawed case." He also provided extensive comments as a consulting party on drafts of the "specious" MOA drafted by the Army Corps and claims to have "extensively studied the history and archeology of the [Hudson River Valley] area." Mr. Nitschke avers he is "familiar with" other power plants owned by PG&E or its subsidiaries and compares the proposed Athens Generating facility to a PG&E generating plant in Pittsfield, Massachusetts with stacks measuring 200 feet which "dominates the area and is one of the most unattractive and oppressive objects in the Berkshires." Mr. Nitschke contends that "[NYISO] reports that, for the next few years, there will be ample electric capacity in Upstate New York but a possible deficiency in New York City and Long Island. The proposed Athens plant would not help overcome the downstate capacity deficiency because of transmission constraints." According to Mr. Nitschke, there are ample alternative "brownfield" sites available for construction of the Athens Generating plant which might not have to be built in any event if the state would rebuild existing abandoned generating facilities. Mr. Nitschke states that the DPS's website lists 21 proposed new power plants while "NYISO is considering more than 80 proposals for new generating facilities in New York," all of which, in Mr. Nitschke's estimation, could never be built. Thus "[i]f not all the proposed generating facilities will be built, then the proposed Athens Generating facility, that has some of the most severe impacts on historic properties in New York State, definitely should not be built." Like Ms. Feder's affidavit, Mr. Nitschke's is replete with factual, historical, archeological, economic and technical data of which he does not appear to have personal or expert knowledge.

**33.** Mr. Jung states the proposed Athens Generating plant is "within several miles of some of the most important nineteenth century Hudson River School of Painting sites, including the Thomas Cole House in Catskill and Olana, the home of Frederick Church. These sites and the surroundings that inspired the Hudson School painters are of prime importance in American art history." Mr. Jung avers in conclusory terms that the construction of the plant will destroy panoramic views of the landscape, impact the viewshed from historical sites, and interfere with the $9 million tourism industry in Columbia County.

**34.** Mr. Sevastopoulo is a First Vice President and Financial advisor for Morgan Stanley and a member of the board of Citizens for the Hudson Valley. He states that Athens Generating submitted no serious analysis of alterna-

In short, the observations, opinions and sentiment espoused by these affiants are simply insufficient to demonstrate that irreparable environmental harm or damage to historical properties will occur if construction of the power plant is not halted. In many cases, the facts and opinions which appear in the affidavits are not based on personal knowledge while those facts and opinions which are in admissible form are irrelevant to the legal analysis herein. For example, Dr. Henshaw's opinion that Article X of the Pub. Serv. Law is insufficient to adequately balance environmental and economic concerns is not relevant since this Court has not been asked to examine the lawfulness of Article X. Moreover, that Dr. Henshaw believes the state statute's review process is not equivalent to the full-fledged EIS required by NEPA is inapposite here since the Army Corps opted not to conduct an EIS under NEPA.

Mr. Downs' status as a environmental student and fisherman hardly qualifies him to opine regarding the environmental impact of construction activities in and around wetlands, the existence of endangered plant species along the Hudson River and the habitats and spawning grounds of the American shad and other fish. Even if Mr. Downs was qualified as an expert in these areas, his conclusory concerns regarding harm to plants, animals and "sensitive" wetlands "in the vicinity" of construction are insufficient to demonstrate that any damage to plant or animal life will actually occur or if so, how it will occur. "An injunction 'may not be used simply to eliminate a possibility of a re-

mote future injury.'" *Carey v. Klutznick,* 637 F.2d 834, 837 (2d Cir.1980) (quoting *New York v. Nuclear Regulatory Comm'n,* 550 F.2d 745, 755 (2d Cir.1977). "[E]very irreparable injury is merely a possibility until it is actual and can no longer be averted. Real and imminent, not remote, irreparable harm is what must be demonstrated . . . ." *Id.*

■ Likewise, the affidavits of Ms. Dunn, Mr. Boyle, Ms. Feder, Mr. Pogliani, Mr. Nitschke, Mr. Jung and Mr. Sevastopoulo contain recitation of environmental, historical, archeological, architectural and economic facts which are based on general public knowledge, personal opinion, speculation and their own concern as residents and supporters of the area to be affected by construction of the power plant. Nothing in these affidavits demonstrates that actual environmental harm or damage to historical property or historical concerns will occur absent intervention by this Court. That the power plant will be situated in or near environmentally sensitive areas and historical sites and homes is not dispositive of whether construction of the facility will have an irreparable negative impact on the environment or historic property. Indeed, the undisputed status of the Hudson River and Valley as a "National Heritage Area," standing alone, does not demonstrate the likelihood of permanent environmental or historical harm. Even if this was not true, each and every one of the facts and concerns outlined by plaintiffs was contemplated, analyzed and reconciled by the Army Corps in its 107–page MFR as well as the MOA executed

---

tives for siting of its proposed plant and "with a very limited budget, Citizens for the Hudson Valley submitted its own analysis of alternatives" which were not "in [his] opinion, given serious consideration." In Mr. Sevastopoulo's view, the state's review of the project "did not even closely approach the analysis of alternatives that should be conducted as part of a federal NEPA review." Mr. Sevastopoulo

further avers "upon reliable information," that National Energy Group, "sister company" to PG&E which has filed for bankruptcy, has not yet obtained the funding to actually build the plant. Thus, in Mr. Sevastopoulo's estimation, Athens Generating will not be prejudiced by a delay in construction activities while the Army Corps prepares a full EIS pursuant to NEPA.

by the Army Corps and various consulting parties. Indeed, it strikes the Court that plaintiffs' failure to produce affidavits from any of the experts involved in reviewing the proposed Athens Generating facility regarding the environmental and/or historical damage likely to occur in the absence of granting an injunction is based on the fact that each of the federal and state agencies and organizations responsible for reviewing and approving the projects and permits at issue in this case has already "signed off" on construction of the facility.

This apparently came as a complete surprise to plaintiffs, who explained through counsel in their supplemental set of submissions to the Court, that they did not know the Army Corps had conducted an EA or prepared the MFR—"in spite of their numerous Freedom of Information Act ("FOIA") requests"—until the telephone conference the Court held on June 18, 2001, concerning their TRO application. In response to learning that the Army Corps had determined no EIS was necessary for permitting of the project, plaintiffs submitted the following additional evidentiary material in support of their application for injunctive relief: 1) the affidavit of Barbara Docktor, a professional photographer and resident of Columbia County, and copies of two photographs taken by Ms. Docktor; [35] 2) an affidavit from Erik Kiviat who holds a doctorate in ecology and is a professor of environmental studies at Bard College where the above-referenced Roger Downs is a student; [36] 3) a supplemental affidavit from

---

**35.** According to Ms. Docktor, one of the photographs depicts the area which Athens Generating had cleared as of June 10, 2001, in furtherance of pre-construction activities at the site of the plant. Contrary to repeated implications and even direct assertions by plaintiffs that the power plant is going to be constructed directly "on" the Hudson River, the photograph shows a square brown area which has been cleared of trees and other vegetation nowhere near anything resembling the Hudson River. Indeed, the cleared area appears to be directly adjacent to a paved road or railway and surrounded by trees, fields and other vegetation. Ms. Docktor avers that the other photograph shows an aerial view of the Hudson River. Ms. Docktor has placed star stickers on the photograph to mark the "approximate" locations of the newly permitted Athens power plant as well as a proposed cement plant currently under review by the state. Ms. Docktor states with no reference to her personal knowledge that when built, the two industrial plants will "sit less than five miles apart on each side of the river and be seen clearly from many perspectives in this National Heritage Area."

**36.** According to his affidavit, Dr. Kiviat conducted a "field reconnaissance" of the proposed Athens Generating facility site accompanied by Mr. Downs. Dr. Kiviat states that the temporary road created to allow access to the Hudson River where the pumping station and intake/discharge pipes will be constructed "crosses federal jurisdiction wetland" with no reference as to the basis of his personal knowledge regarding the scope or location of federally protected wetlands. Further, Dr. Kiviat states that this wetland "could support rare plants or animals" as suggested by "indicators that are commonly associated with the occurrence of rare plants and animals in the Hudson Valley." Moreover, Dr. Kiviat avers that "[t]he proposed access road and transmission line towers could directly affect State-listed rare species that might occur in the footprint of this infrastructure or that might be vulnerable to altered hydrology upstream or downstream of the access road." In Dr. Kiviat's hypothetical and conclusory estimation, "[a]lthough the access road is intended to be temporary, its effects on rare species could be permanent." Although Dr. Kiviat claims to have seen a "freshly dead common snipe on the railroad" [near where a plant pipeline is intended to cross the Corlaer Kill] and heard two rare birds—the bobolink and alder flycatcher—singing in the vicinity of the Athens Flat wet meadow, he does not state or even suggest that the snipe's death was caused by construction activities connected to the plant or that the singing birds nest or breed in the area and would thereby be impacted by facility construction. Dr. Kiviat also hypothesizes that "[t]he Corlaer Kill is likely to support wood turtle (State Special

Mr. Downs to which he attaches portions of a workbook entitled "Mastering NEPA: A Step by Step Approach," as well as a guide published by the New York DOS entitled "Hudson River Significant Tidal Habitats;" [37] 4) the supplemental affidavit of Dr. Henshaw who opines that the MFR "suffers from grammatical and analytic errors leading to unjustified conclusions;" [38] 5) a memorandum dated November 8, 1999, from an employee named Steve Resler of the Department of State Division of Coastal Resources which summarizes a public hearing regarding the proposed Athens Generating plant and recounts that Joe Seebode of the Army Corps "indicated to [him] that given the range of substantive issues involving the proposal and the controversy concerning it, the Corps is quite likely to require the preparation of a [NEPA EIS;]" 6) a memorandum from the Council on Environmental Quality's website entitled "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Regulations," many of which explain the scope of an agency's obligations when preparing an EIS; 7) portions of the Article X administrative transcript which,

Concern) and winged monkeyflower." Finally, Dr. Kiviat notes that he observed heartleaf plantain "approximately 60 feet" from "flags which [he] believe[s] indicate the center line of the pipeline." Dr. Kiviat, describes the soils above the pump station site and heartleaf plantain as "unstable," previously subject to "vista clearing," and showing signs of "slumping and gullying" which render it vulnerable to "severe colluviation," or downslope movement of the soil in which case there is a "high probability" of damage to heartleaf plantain and other rare plants reported at the site (although not observed by Dr. Kiviat.) Dr. Kiviat avers that "colluviation could also affect the fish community of the river near this location."

"cumulative" and "precedent-setting" effect of permitting a project. In Mr. Downs' estimation, this obligated the Army Corps to consider the cumulative impact of the Athens Generating project along with the proposed St. Lawrence Cement plant, "which are relatively close together." Indeed, Mr. Downs notes that he "understand[s] that the St. Lawrence Cement is already using the Army Corps' permitting of the Athens Plant in support of their own huge industrial project." Finally, Mr. Downs states that the other publication attached to his affidavit "describes the areas in the general vicinity of the proposed pump house and intake/discharge facility, which is in an environmentally sensitive area containing threatened/endangered species." Mr. Downs placed an area on a part of a map taken from the book in the "approximate location" where the pumping station will be constructed.

37. According to Mr. Downs, the former publication states that "[a]t a minimum ... [a federal] agency must make [an] EA available to the public on request," and yet neither he nor any other concerned member of the public was informed that the Army Corps was preparing an EA or had declined to undertake an EIS. Mr. Downs criticizes the failure of the Army Corps in the MFR to consider the alternative of using a cooling pond or other water source in lieu of taking water from the Hudson River. Mr. Downs' affidavit further recounts some of the same conclusory observations as Dr. Kiviat's concerning the potential impact of plant construction on soil stability as well as rare animal and plant species. Mr. Downs also criticizes the Army Corps failure to follow NEPA's requirement—as set forth in the afore-referenced "Mastering NEPA" guide—that a reviewing agency consider the

38. Dr. Henshaw's supplemental affidavit is essentially a lengthy discussion concerning the Army Corps' failure to conduct the type of in-depth analysis required to prepare an EIS under NEPA. In particular, Dr. Henshaw faults the Army Corps for failing to adequately invite and record formal public input or consider alternative sites, transmission problems, cumulative impact of other proposed projects, effects on tourism, spoilation of historic vistas, and finally, the potential effects of the project of mature forests in the area and "possibl[e] dewatering [of] part or all of the water-dependent wetlands" at and east of the construction site. Of course the fact that the Army Corps ultimately determined that an

according to plaintiff's counsel, "evidenc[e] the applicant's lack of commitment to selling the power from the Athens Plant within New York State;" 8) an affidavit from Christopher Lindner who has a Ph.D. in anthropology and prepared a dissertation on the "archaeology, geomorphology and environmental history of the Scoharie Creek section of the Hudson River drainage in New York State and has been intricately involved in studying and teaching the archaeological history of the Hudson River Valley area;"[39] 9) a supplemental affidavit from Peter Jung who questions the determination of the Army Corps not to prepare an EIS concerning the cumulative impact of the Athens Generating facility will have on the historic viewshed from Olana when combined with the proposal by St. Lawrence Cement to build a new plant "directly across the River" from the power plant and the announcement by Lehigh Cement that it may "re-fire" its old kiln in the hamlet of Cementon, "just miles away" from the proposed cement and power plants;[40] 10) a copy of an un-

sworn letter dated June 19, 2001, from Richard Moe, President of the National Trust for Historic Preservation, to Richard Tomer, Acting Chief of the New York District Office of the Army Corps outlining the agency's decision not to sign the MOA as had been anticipated by the Army Corps and various consulting parties;[41] 11) an affidavit from Alexander Boyle, an art dealer and art historian, who co-authored a book entitled "Acid Rain" and directed a PBS documentary based on the Hudson River School of painting founded by Thomas Cole in which he recounts a "statement" given by a professor of American Art at Princeton University in opposition to a proposal for a nuclear power plant in the vicinity of the proposed Athens Generating site over twenty years ago[42]; 12) a signed but unsworn "statement" of Robert Boyle dated June 23, 2001, which, according to plaintiffs, gives "an historical perspective on the Corps' prior environmental analyses in [prior controversial industrial projects,] as well as insights from 37 years of experience as

EIS was not necessary renders much of Dr. Henshaw's criticism inapposite.

39. Although Dr. Lindner appears to have expansive knowledge of the archaeology of the area in the vicinity of where the Athens Generating plant is to be built, he discusses the potential impact of construction and operation of the facility on these archaeological sites in merely conclusory terms. For example, in discussing West Athens Hill, a prehistoric "high ridge flint quarry," he states that "[a] massive plant less than two miles away would irreparably harm the vision of the past this viewshed offers." Further, according to Dr. Lindner, "[t]he MFR also fails to consider issues of landscape archaeology from West Athens Hills and other viewpoints, which is, in [his] opinion, a serious omission."

40. Indeed, Mr. Jung finds the determination not to prepare an EIS particularly curious because in proposing to restore the structures, collections and landscape at Olana, SHPO was required to prepare and submit an EIS with full public notice and participation.

41. The letter—which is not in admissible form in any event—states that although the National Trust had anticipated signing the MOA based on the parties' "willingness to consider significant steps to mitigate the adverse impacts of the proposed project," the agency still had unresolved concerns regarding the absence of consideration of alternative sites for the Athens Generating project and the cumulative impact of the generating facility on other "re-industrialization" efforts afoot in the Hudson River Valley. Thus, the letter concludes that "despite the merits of the agreement within the specific context of the Section 106 process, [the agency was] concerned that [its] concurrence in the [MOA] may be read by some to indicate that the agreement addresses [the agency's] broader concerns about the siting of industrial facilities in the Valley."

42. Indeed, attached to Mr. Boyle's affidavit is an unsworn copy of the same statement dated June 21, 2001, signed by its author, Dr. John Wilmerding.

one of the pre-eminent environmentalist [sic]"; 13) the affidavit of Susan Falzon, a resident of Athens and member of S.T.O.P.P. who submits the "comments" of Donald Jenson, a retired geologist and hydrologist, concerning the potential environmental impact of the Athens Generating facility, "based on [her] conversations with Mr. Jenson and review of his notes;[43]" and finally 14) an unnotarized supplemental "declaration" from Mr. Nitschke who details, without reference to his personal knowledge, various "factual errors" in the MFR prepared by the Army Corps including the size of the cooling tower required for "dry" cooling technology and the visibility of stack plumes."

In response to papers submitted by the Army Corps and Athens Generating in opposition to the application for injunctive relief, plaintiffs filed a second set of supplemental submissions in support of their motion which primarily attempt to demonstrate that the Army Corps knew about the proposed St. Lawrence Cement plant and nevertheless ignored potential cumulative impacts of same in permitting the Athens Generating facility and that the Army Corps failed to release the EA or MFR for public comment. Included in plaintiff's second supplemental submissions are the following: 1) a letter dated June 22, 1999, and copied to the Army Corps—from DOS's Division of Coastal Resources to St. Lawrence Cement Company concerning the company's need to prepare a draft EIS; 2) a letter dated January 31, 2001, from St. Lawrence Cement in response to the Division of Coastal Resources—also copied to the Army Corps; 3) a letter from the Division of Coastal Resources to St. Lawrence Cement advising the company of the time period in which the agency would be reviewing its proposal—which was again copied to the Army Corps; 4) an affidavit from Laura Skutch, Director of Citizens for the Hudson Valley, who refutes any attempt by the Army Corps to suggest it did not know about the proposed St. Lawrence Cement plant prior to issuing a permit to Athens Generating by recounting conversations with Christine Delorier, the Army Corps' field officer in the Albany/Troy regulatory branch office in which Ms. Delorier acknowledged her status as "principle agent" responsible for reviewing the cement plant project "approximately six to eight months" prior to June 29, 2001, as well as Ms. Skutch's success at obtaining the afore-referenced items of correspondence between St. Lawrence Cement and Department of State; 5) an affidavit from Ian Goodman, President of The Goodman Group, Ltd., a consulting firm which "specializ[es] in electricity resource planning and related issues;"[44] 6) an unnotarized second supplemental "declaration" from Ian Nitschke which compares statements in the affidavits of Athens Generating's witnesses concerning future electricity supply and demand in New York

---

**43.** Ms. Falzon avers that her restatement of Mr. Jenson's opinions is necessary based on his "current medical condition and the shortness of time given to submit comments to the court," but curiously, attached to Ms. Falzon's affidavit are two unsworn statements and/or memoranda by Mr. Jenson signed and dated June 24, 2001.

**44.** Plaintiffs submitted Mr. Goodman's affidavit presumably to controvert the allegations by Athens Generating that disruption or delay in construction of the Athens Generating facil-

ity will have a negative future impact on New York's supply of electricity and result in shortages, brownouts and possibly even blackouts. According to Mr. Goodman, he reviewed the affidavits of witnesses submitted by Athens Generating regarding this concern as well as a "variety of documents relating to the supply and demand situation in New York" and concluded that "none of the information I have reviewed indicates that there would be any significant adverse impact upon the state's electricity supply from delay, or even cancellation of the Athens plant."

with an attached publication from NYISO regarding same and concludes that "the Athens Generating plant [is not] needed to ensure that there is adequate generating capacity in New York to meet customers' needs" and [t]he northeast region, as a whole, has a substantial surplus [of electricity] for the next several years;" 7) a supplemental affidavit from Mr. Sevastopoulo who again, with no reference to his personal knowledge, details the financial status of PG&E and its relationship to National Energy Group, which is allegedly seeking financing to build the Athens Generating facility and repeats his concerns regarding the ability of Athens Generating to complete construction of the plant; [45] 8) a further unsworn "declaration" by Dr. Henshaw who opines that counsel for Athens Generating "seems to recognize that cumulative impacts of the earlier Corps approval of the Project are the Achilles Heel of this project" when she "tellingly relegated her rebuttal of this point to only two paragraphs of unsubstantiated denial" of the Army Corps' obligation to consider the potential impact of as yet proposed or built industrial projects in the Hudson River Valley area prior to approving the Athens Generating facility; [46] 9) a copy of a New York Times article dated January 14, 2001, setting forth the author's brief interview of Clarence D. Rappleyea, Chairman and CEO of the New York Power Authority concerning the likelihood that the power crisis in California would migrate east to New York State; and finally 10) a copy of an order issued by the Federal Energy Regulatory Commission ("FERC") which set rates for the power proposed to be produced by Athens Generating.

After review of these voluminous submissions, it is apparent that plaintiffs and the various other interested and concerned parties who have objected to construction of the proposed generating facility in Athens ardently believe that the project will degrade the value and enjoyment of their property and the area as well as permanently mar the ecologically sensitive Hudson River and Valley. However, the Court finds there is insufficient competent, admissible or relevant evidence to establish that any irreparable environmental, historical, archeological or aesthetic harm will

**45.** As a further matter, Mr. Sevastopoulo, who is not a lawyer, states that under the former provision of the Pub. Serv. Law which regulated approval of power plants in New York, "a utility had to reveal the economics of an electric generation facility in order to avoid the consequences cited above." According to Mr. Sevastopoulo, "[t]here are no such protections for the public under New York's Article 10 which removes the burden of proof from the project's sponsor and has us, the People, believe that the sponsor's assurances in court, the press and public forums are truthful and beyond scrutiny."

**46.** In his unsworn declaration, Dr. Henshaw states that the St. Lawrence Cement company "has been very direct that it considers the Athens decision as opening the door for its application." Indeed, Dr. Henshaw avers "[o]n 3 August 2000 Ms. Denise Brubaker, Environmental Manager, SLC [St. Lawrence Cement], stated to me approximately 'once the Athens Power Plant is approved, we [SLC] should be able to get our approval' (personal communication)." Aside from the fact that the "declaration" itself is not in admissible form, the Court is not persuaded that Dr. Henshaw's "approximate" recollection of a statement made by someone at St. Lawrence Cement is evidentiary or even relevant to the present inquiry. And although, Dr. Henshaw recognizes he is "not competent" to substantively opine on the subject, he nevertheless attempts to demonstrate that New York's ability to produce sufficient electricity capacity will be met by new generation plants "coming on line in the very near future" as proven by the "table of Article X cases" which appears on DOS's website. Dr. Henshaw caps his opinion concerning future electric capacity by offering his "best estimate[s]" of whether the proposed new generating facilities are inside of the "transmission constraints to the southeastern part of New York State."

occur absent intervention by the Court in halting construction. Even if this were not true, however, plaintiffs have also failed to demonstrate the likelihood of their success on the merits in this case which prevents the Court from granting their request for injunctive relief in any event.

2. *Likelihood of Plaintiffs' Success on Merits*

a. NEPA and its Attendant Regulations

■ On January 1, 1970, NEPA was enacted to promote a national policy which would "encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. To achieve this national policy, NEPA requires that federal agencies proposing "major Federal actions significantly affecting the quality of the human environment" include in their proposals or recommendations an EIS which provides an assessment of the beneficial and adverse environmental impacts of the proposed action. 42 U.S.C. § 4332(2)(C). An EIS is evidence that an agency has considered the reasonably foreseeable environmental effects of a pro-

posed major action before making a decision to take the action. However, an EIS is not required where the major federal action is not "significant" within the meaning of NEPA. *Hanly v. Kleindienst ("Hanly II")*, 471 F.2d 823, 830 (2d Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

b. Scope of Review

■ The issue of whether a particular agency's action is a "major federal action"[47] which will have a "significant" effect on the environment is a substantive issue which has traditionally been left to the informed discretion of the agency proposing or permitting the action or project. *See Sierra Club v. United States Army Corps of Eng'rs*, 701 F.2d 1011, 1029 (2d Cir.1983); *see also Scenic Hudson Pres. Conference v. Fed. Power Comm'n*, 453 F.2d 463, 480 (2d Cir.1971) *cert. denied*, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1972) ("[T]he resolution of highly complex technological issues such as these was entrusted by Congress to the [agency] and not to the courts."). NEPA does, however, provide a procedural framework within

47. Plaintiffs argue in the first instance that the Army Corps erred by failing to categorize the proposed Athens power plant as a "major federal action." Indeed, implicit in the Army Corps' determination that the project would have no significant environmental impact is a finding that its granting of a permit to Athens Generating did not constitute a major federal action. CEQ regulations define "major federal actions" to include "actions with effects that may be major and which are subject to Federal control and responsibility." 40 C.F.R. § 1508.18. When the facts material to a determination of the scope of a "major federal action" such as degree of control federal agencies exert over related private actions are in dispute, "courts are generally no less expert than agencies in settling such disputes." *Landmark West! v. United States Postal Serv.*, 840 F.Supp. 994, 1004 (S.D.N.Y. 1993). Further, "because such determinations are often implicit, agencies may not

have engaged in fact-finding on the issue." *Id.* For these reasons, "courts apply the 'reasonableness under the circumstances' standard in reviewing whether an agency has properly drawn the line between federal action and private action." *Id.* In view of the fact that Athens Generating was required to apply to the New York State Siting Board to build the plant in the first instance and to request water and air pollution control permits from DEC which agency will continue to regulate air and water emissions from the plant, the Court finds that the Army Corps' implicit determination that its permitting and continued oversight of small, limited portions of the plant—water intake and discharge heads, piping, an access road and a portion of one cooling tower—in waters and wetlands of the United States, was not a major federal action was reasonable under the circumstances.

which substantive judgments must be made. Courts must ensure that agencies comply with the "procedural duties" mandated by NEPA, *see Kleppe v. Sierra Club*, 427 U.S. 390, 406, n. 15, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), while still assuring compliance with the substantive purposes of the statute.

Plaintiffs argue that the Army Corps committed several procedural violations of NEPA and/or its attendant regulations in issuing its EA and determination of no significant impact. In the first instance, plaintiffs contend that the EA completed by the Army Corps on May 25, 2001, "betrays [the agency's] complete prejudgment of the question of whether or not the proposed Athens Plant would cause significant environmental impacts" based on the MOA which was executed by the various parties including the Army Corps on May 14, 2001. The "pre-EA" endorsement of the Army Corps on the MOA, however, is inapposite to the agency's "objectivity" in reviewing the environmental impacts of the Athens Generating facility or its compliance with NEPA since the MOA was intended only to address the Army Corps' analysis of the proposed project and its potential effects on cultural resources pursuant to NHPA.

■ Citing *Greene County Planning Bd. v. Fed. Power Comm'n*, 455 F.2d 412 (2d Cir.) *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), plaintiffs also argue that the Army Corps impermissibly relied on the findings of the state administrative law judges during the Article X process in issuing a finding of no significant environmental impact. In the first instance it is apparent from review of the MFR and EA that the Army Corps did not simply adopt and circulate the determination of a state agency regarding environmental impacts of the Athens Generating facility. Rather, the MFR and EA detail the Army Corps' consultation with

appropriate state and federal agencies, consideration of the state's findings and its own analysis of environmental issues. Furthermore, plaintiff's criticism of the Army Corps reference to factual findings made in the Article X proceeding is misplaced since the regulations which govern NEPA compliance specifically require federal agencies to "cooperate with" state agencies to "reduce duplication between NEPA and State" requirements. 40 C.F.R. § 1506.2(b).

■ Plaintiffs contend further that the Army Corps violated NEPA because the agency based its finding of no significant impact in large part on mitigation measures employed by Athens Generating at the behest of various agencies and organizations which reviewed the project. According to plaintiffs, "the question of significance is to be addressed separately and, logically, prior to the problem of mitigation." Plaintiffs simply misstate and misconstrue current law on this issue. To wit, NEPA affords federal agencies latitude in considering mitigation measures which might minimize environmental impacts to a level of no or little significance *if* such measures are supported by substantial evidence. *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 17 (2d Cir.1997) (citations omitted). In this Court's view, the Army Corps relied heavily but reasonably on the agreement by Athens Generating to switch from hybrid to dry cooling technology which, as demonstrated via documentary and testimonial evidence in the Article X hearings, would undisputedly eliminate and/or significantly reduce many, if not all, of the environmental and aesthetic concerns raised by state agencies and the public regarding the project.

■ Plaintiffs also aver that the Army Corps failed to conduct any meaningful analyses of alternatives to the proposed project including the "no action"

alternative. As referenced above, however at note 8, the Army Corps did review the alternative sites analyses completed during the Article X process and considered the option of not building the plant at all but ultimately concluded that the project was needed and that the alternative sites proposed by Athens Generating and the public were not viable or were less desirable than the proposed Athens site. Under NEPA, the range of alternatives which an agency is required to consider is within its discretion. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 551–52, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Notably, where an agency determines as a threshold matter that an EIS is not required under NEPA, the scope of practicable alternatives analysis is narrowed considerably but ultimately governed by the "rule of reason" given the scope and purpose of the project under consideration. *See City of New York v. United States Dep't of Transp.,* 715 F.2d 732, 742–43 (2d Cir.1983). Based thereupon, this Court finds that the Army Corps engaged in a meaningful and reasonable review of alternatives to the project. NEPA requires no more.

■ Plaintiffs allege that the Army Corps violated NEPA and perhaps FOIA by failing to make its EA and MFR available for public review and/or comment prior to issuance of the documents. Although plaintiffs correctly assert that such pre-

filing disclosure and public involvement is required prior to an agency's issuance of an EIS, or in "certain limited circumstances" involving actions which "normally require[ ] the preparation of an [EIS]," 40 C.F.R. § 1501.4(e)(2)(i), an EA does not carry the same burden. Indeed, CEQ regulations provide that agencies must "involve the public" in the NEPA process, 40 C.F.R. § 1506.6(a) and should make any finding of no significant environmental impact "available to the public." 40 C.F.R. § 1502(e)(1). The Army Corps clearly involved the public in its NEPA review process by publishing notice of the action, holding public hearings and incorporating the litany of public concerns raised about the project in the MFR. Moreover, notwithstanding plaintiffs' indignation at not receiving notice of the MFR and EA prior to commencement of the present litigation, there is no evidence that the Army Corps misled plaintiffs about the existence of such documents or its intention to issue them. Although plaintiffs' interest in the outcome of the Army Corps review of the project was undoubtedly intense, CEQ regulations do not require federal agencies to notify the concerned public in advance of or even contemporaneously with issuing an EA or finding of no significant environmental impact. Rather, such findings and documents are to be made available upon request via standard FOIA procedures.[48]

---

**48.** That plaintiffs may not have been aware of the fact that the MFR and EA had been filed and did not have copies of the documents until recently is not dispositive of whether the Army Corps prevented plaintiffs from obtaining copies through FOIA. Indeed, the Army Corps submitted an affidavit from Rita Fisher, its Assistant FOIA Officer, who stated that all FOIA requests made by Laura Skutch, director of Citizens for the Hudson Valley, had been complied with prior to issuance of the permit to Athens Generating and that the organization had no "open" FOIA requests pending at the time the permit was issued.

Furthermore, Ms. Fisher averred that the only FOIA request which Ms. Skutch made subsequent to issuance of the Army Corps permit demanded that the entire Athens Generating file be moved from Troy, New York to New York City for review by plaintiffs' counsel and others within 48 hours rather than the 20 days normally allotted to comply with FOIA demands. According to Ms. Fisher and the letter she attached from Ms. Skutch, at no time did Ms. Skutch nor anyone else associated with plaintiffs request copies of the MFR or EA.

■ Finally, plaintiffs argue that the Army Corps erred in failing to consider the "cumulative impact" of other industrial projects in the Hudson River Valley area as required by NEPA, Plaintiffs contend that at the time it issued its permit to Athens Generating, the Army Corps "most certainly knew that St. Lawrence Cement Co. is planning to construct one of the largest coal burning cement plants directly across the River in the Hudson/Greenport area." In fact plaintiffs have submitted no competent admissible evidence to establish that at the time the Army Corps issued its permit to Athens Generating, St. Lawrence Cement Company was planning or had applied to build such a plant, that the alleged proposed plant would be anywhere near the Athens Generating facility or that the alleged proposed plant was more than a proposal. There is no competent admissible evidence before the Court demonstrating that at the time the Army Corps was engaged in its NEPA review of the Athens Generating facility, the alleged St. Lawrence Cement Co. project had been subject to state administrative review and approved and permitted by the appropriate state and/or federal agencies. The aerial photograph submitted by Barbara Docktor purporting to show with red star stickers the "approximate" locations of the two proposed plants on either side of the River is clearly not relevant or admissible on this issue.

Even if this was not true, however, plaintiffs have not submitted any evidence that the Army Corps of Engineers had any knowledge that St. Lawrence Cement Co. had been or would be permitted to construct a new plant in the vicinity of the Athens Generating facility at the time it issued its permit in this case. Clearly, the unauthenticated copies of letters attached to Ms. Skutch's affidavit between DOS and St. Lawrence Cement Co. which indicate they were forwarded to the Army Corps are unpersuasive in this regard as are Ms. Skutch's conversations with Christine Delorier of the Army Corps concerning that agency's obligation to review the proposed St. Lawrence Cement Co. project after completing review of the Athens Generating project. NEPA does not require federal agencies to consider the cumulative effects of industrial projects which are "speculative and contingent." *Village of Grand View v. Skinner,* 947 F.2d 651, 659 (2d Cir.1991).

Turning to plaintiffs' substantive NEPA claim—that the Army Corps' conclusion that no EIS was required in this case was erroneous—the determination of "no significant impact" [49] is neither a rulemaking nor an adjudicatory function of the Army Corps, but rather a factual finding made by an agency with particular expertise in environmental matters. The appropriate scope of review is therefore prescribed by the Administrative Procedure Act ("APA"), which provides that agency action may be overruled by a court only if the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *City of New York v. United States Dep't of Transp.,* 715 F.2d at 748; *Cross–Sound Ferry Serv., Inc. v. United States,* 573 F.2d 725, 729 (2d Cir.1978); *Hanly II,* 471 F.2d at 828–29.

---

49. CEQ regulations provide that a "finding of no significant impact" means a document filed by a federal agency which briefly presents the reasons why an action "will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared" and includes the environmental assessment or a summary of it as well as any other related environmental documents. 40 C.F.R. § 1508.13.

In *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam), the Supreme Court addressed the question of the scope of review of agency decisions on environmental issues. Although the holding of the case is limited to the question of whether NEPA requires the agencies to elevate environmental concerns over other legitimate concerns, the Court quoted from *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. 1197, in finding that, under NEPA, the judicially reviewable duties imposed on agencies are "essentially procedural," and that "once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences." 444 U.S. at 227, 100 S.Ct. 497. A court cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe*, 427 U.S. at 410, n. 21, 96 S.Ct. 2718 (quoting *Natural Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 838 (D.C.Cir.1972)).

In view of this limit on reexamination of the environmental issues in this case, the Court's primary concern is whether the EA or MFR prepared by the Army Corps contains the type of reasoned elaboration required to support the agency's determination not to prepare a more elaborate EIS. In short, this Court's appropriate role is to ensure that the Army Corps has taken a "hard look" at the environmental consequences which are likely to result from the proposed Athens Generating facility and whether the agency has convincingly documented its determination of "no significant impact." *See, e.g., Maryland–National Capital Park & Planning Comm'n v. United States Postal Serv.*, 487 F.2d 1029, 1040 (D.C.Cir.1973). In light of the substantial state and federal administrative review processes that occurred in this case in addition to judicial review by the Third Department and the expansive MFR prepared by the Army Corps, this Court finds that the agency did not abuse its discretion in not issuing an EIS. *See City of New York v. United States Dep't of Transp.*, 715 F.2d at 746 n. 14 ("The fact that effects are only a possibility does not insulate the proposed action from consideration under NEPA, but it does accord an agency some latitude in determining whether the risk is sufficient to require preparation of an EIS."). Something more than the mere speculation and conclusory assertions by plaintiffs that construction and operation of the Athens Generating facility will result in significant environmental, historical, archaeological, aesthetic and economic impacts is necessary before this Court could find the Army Corps abused its discretion or acted not in accordance with the law under the APA.

Since plaintiffs have not, in this Court's view, supported their motion with evidence that the Army Corps violated any of NEPA's substantive or procedural requirements, that its challenged determination was not supported by substantial evidence, that the agency was arbitrary and capricious or abused its discretion, it is not likely to be within the competence of this Court to overrule the Army Corps' determination. *See City of New York v. United States Dep't of Transp.*, 715 F.2d at 745, 748; *Morningside Renewal Council, Inc. v. United States Atomic Energy Comm'n*, 482 F.2d 234, 238 (2d Cir.1973); *Scenic Hudson Pres. Conference v. Fed. Power Comm'n*, 453 F.2d at 468.

c. Plaintiffs' NHPA claim

Although the thrust of plaintiffs' arguments herein concern the Army Corps' alleged failure to follow the requirements of NEPA in issuing a permit to Athens Generating, they also assert that the agency violated NHPA. To wit, plaintiffs argue that the Army Corps analysis of

the impact of the proposed project on cultural and historical resources in the area was not "reasonable and in good faith" as required by NHPA and its attendant regulations. 36 C.F.R. § 800.4(b). NHPA "was passed with the specific intention of identifying [historic resources] and assuring their continued existence." *Pres. Coalition of Erie County v. Fed. Trans. Admin.*, 129 F.Supp.2d 551, 575 (W.D.N.Y. 2000). In the present case, there is no evidence that any historic resources will be physically destroyed. To the contrary, plaintiffs claim that the viewsheds from historic properties and places will be affected by construction of the plant. However, to the extent that NHPA regulations require federal agencies to identify adverse effects to historic properties from proposed actions and prevent or mitigate those effects, the Army Corps clearly did so in this case. Indeed, the Army Corps conducted an analysis of the impacts to cultural and historic resources as required by Section 106 of NHPA and ultimately issued an MOA which was executed by SHPO, the state office specifically designated to preserve and protect historic and cultural resources. By executing the document, SHPO acknowledged that the Army Corps had fulfilled its obligations pursuant to Section 106 of NHPA. This Court is unlikely to second guess that expert and informed determination.

Having failed to establish either the likelihood of irreparable harm or success on their claims under either NEPA, the APA or NHPA, plaintiffs' application for injunctive relief must be and hereby is DENIED.

### B. *Motion to Intervene by Athens Generating*

The Court notes the divergent views of the various circuits concerning the issue of intervention by non-governmental parties in NEPA compliance cases, *see, e.g., Sierra Club v. Espy,* 18 F.3d 1202, 1207 (5th Cir.1994) (reversing district court's denial of intervention as of right to trade associations which had legally protectable property interest in existing timber contracts threatened by challenge to management of logging program by United States Forest Service); *Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105, 1114 (9th Cir.2000) (only federal government may be defendant in NEPA compliance action; private parties asserting requisite property or financial interests may intervene in remedial phase of action); *Kleissler v. United States Forest Service,* 157 F.3d 964, 971 (3rd Cir.1998) (disagreeing with Ninth Circuit's categorical rule barring private support for governmental agencies in NEPA compliance actions), but need not reach this issue in this case. The only "legally protectable" interest of Athens Generating which might be impaired or affected herein is its right to continue pre-construction work followed by construction of the power plant within the confines of its state and federal permits during the pendency of this NEPA compliance action. This Court has denied plaintiffs' application for a preliminary injunction halting such activities while plaintiffs prosecute their NEPA and APA claims against the Army Corps. Thus, Athens Generating has no present legal interest warranting intervention as of right under Fed.R.Civ.P. 24(a) nor does this Court view its current status as triggering permissive intervention pursuant to Fed. R.Civ.P. 24(b). If plaintiffs ultimately prevail in obtaining a determination that the Army Corps failed to follow NEPA's requirements in issuing a finding of no significant impact, the Court will entertain anew any application by Athens Generating to participate in the remedial phase of this action. Based thereupon, the application by Athens Generating to intervene as of right or by permission in accordance

with Fed.R.Civ.P. 24 is DENIED without prejudice.

## IV. CONCLUSION

The Court notes that the present action by plaintiffs is nearly the last depot in a four-year administrative, political and legal odyssey which will likely result in construction of this very controversial power plant. Controversy notwithstanding, however, nearly every state and federal official, agency and organization with any interest or oversight in this matter has reviewed the potential environmental, historical and aesthetic impacts of the Athens Generating project and reconciled them with equally important and arguably more pressing economic and societal concerns. No one seriously disputes that New York, like other populous states, faces potentially devastating economic consequences if it does not take meaningful action to ensure the continued reliability of its power supply in the face of ever-increasing consumer demand. Indeed, newspapers and news broadcasts are flooded with reports that the state and nation are confronting a new and gripping energy crisis.

Yet solutions to the crisis inexorably pit the public, the government and industry which generally agree that something must be done against those who must look at and live with the results of progress in their own backyards and communities. While the Court recognizes and appreciates plaintiffs' impassioned opposition to the Athens Generating plant and the conviction with which they assembled their present legal challenge, it is not likely to invalidate the considered and reasonable judgment of the experts who have already struggled with and examined plaintiffs' concerns on the basis of their current submissions. In this case, the Army Corps permitted and approved the project based on its determination that there was sufficient evidence to suggest any significant environmental or aesthetic impacts would be eliminated or dramatically reduced by appropriate mitigation measures and unavoidable remaining impacts would not be significant. Thus, the Army Corps concluded that an EIS was not required pursuant to NEPA. Based on the evidence submitted in connection with this motion, the Court cannot say that plaintiffs are likely to persuade it otherwise.

In view of the foregoing, plaintiffs' motion for a preliminary injunction is DENIED and the motion by Athens Generating to intervene is likewise DENIED.

IT IS SO ORDERED.