[723 NYS2d 532]

In the Matter of CITIZENS FOR THE HUDSON VALLEY et al.,
Petitioners, v NEW YORK STATE BOARD ON ELECTRIC GEN-
ERATION SITING AND THE ENVIRONMENT et al., Respondents.

Third Department, April 12, 2001

**APPEARANCES OF COUNSEL**

*Carl G. Dworkin,* Albany, for petitioners.

*Eliot Spitzer, Attorney General,* Albany (*John J. Sipos* of counsel), for State of New York, respondent.

*Lawrence G. Malone, General Counsel,* Albany (*Carl F. Patka* of counsel), for New York State Board on Electric Generation Siting and the Environment and another, respondents.

*Nixon Peabody L. L. P.,* Albany (*Ruth E. Leistensnider* of counsel), and *Read & Laniado, L. L. P.,* for Athens Generating Company, L. P., respondent.

**OPINION OF THE COURT**

MERCURE, J. P.

Public Service Law article X (*see,* L 1992, ch 519, § 6, as amended by L 1999, ch 636) provides for a comprehensive review of environmental and public interest impacts and the issuance of a certificate of environmental compatibility and public need as a precondition to the siting of a major electric generating facility, i.e., one with an output of 80,000 kilowatts or more, within the State (Public Service Law § 160 [2]; § 162). Ultimate authority for the prescribed review and issuance of a certificate is invested in respondent State Board on Electric Generation Siting and the Environment (hereinafter the Siting Board), within the Department of Public Service, which consists of the Chair of the Department of Public Service, the Commissioner of Environmental Conservation, the Commissioner of Health, the Chair of the Energy Research and Development Authority, the Commissioner of Economic Development, and two ad hoc public members appointed by the Governor (Public Service Law § 160 [4]).

The present application by respondent Athens Generating Company, L. P. (hereinafter AGC) for the construction and operation of a 1,080 megawatt natural gas-fired combined cycle combustion turbine generating facility on industrially zoned land in the Town of Athens, Greene County, is the first application to come before the Siting Board under the provisions of Public Service Law article X. AGC's proposed plant consists of three separate generation units, each with its own emission stack, a common cooling tower and an administrative building. Support facilities include an intake-discharge facility, located three miles away on the Hudson River, which would supply water to the plant and return discharge water through a series of underground pipes. The plant will be connected to the Iroquois natural gas pipeline, located some 2,000 feet to the north of the facility, and deliver electricity to Niagara Mohawk Power Corporation's Leeds Substation, which is located on an

adjacent parcel of land approximately 2,000 feet southeast of the facility.

The administrative proceedings at issue here commenced with the filing of AGC's preapplication report pursuant to Public Service Law § 163 on September 9, 1997. Public input was gathered in hearings and by mail, telephone and the Internet. Simultaneously, a formal stipulation process defined the appropriate preapplication environmental studies, which were completed by AGC and its consultants. On August 28, 1998, AGC filed its application for a certificate of environmental compatibility and public need (hereinafter certificate), and the Siting Board Chair determined that the application was complete on October 22, 1998. Administrative Law Judges from the Department of Environmental Conservation (hereinafter DEC) and the Department of Public Service were appointed to serve as Hearing Examiners. They conducted a prehearing conference and public statement hearings in November 1998. Following prefiled testimony on all issues, hearings were held in March, April and June 1999. After a round of initial and reply briefs from petitioner Citizens for the Hudson Valley (hereinafter petitioner) and a number of other parties, the Hearing Examiners issued a 339-page recommended decision on September 3, 1999 recommending that the Siting Board grant a certificate, subject to a number of specified terms and conditions.

Briefs to the Siting Board excepting to the recommended decision, and further briefs opposing the exceptions, were filed in September and October 1999. On November 30, 1999, the Siting Board Chair requested supplemental information on the plant's cooling technology, visual impacts, and related issues. On remand, the Hearing Examiners considered a number of issues, including the facility's proposed configuration if dry cooling technology were to be utilized. Responsive and rebuttal testimony was filed in December 1999 and January 2000. Additional hearings were held on January 26 and 27, 2000, and supplemental initial briefs and reply briefs were filed by the parties in February 2000.

AGC's application for a Public Service Law article X certification also included applications to DEC for a State Pollutant Discharge Elimination System (hereinafter SPDES) permit for the withdrawal of water from the Hudson River for cooling purposes and the subsequent discharge of the unevaporated remainder. Based upon the determination by the Commissioner of Environmental Conservation that water intake should be

limited to 0.18 million gallons per day in order to satisfy "best technology available" requirements and avoid adverse impacts on Hudson River fish populations, the SPDES permit issued by DEC on June 12, 2000 effectively required that the plant utilize dry cooling technology.

In a 123-page opinion and order issued June 15, 2000, the Siting Board granted AGC a certificate to construct the plant subject to certain conditions. As required by law, the Siting Board made several findings including: (1) a determination that the plant was selected pursuant to an approved procurement process and would serve the public interest (*see*, Public Service Law § 168 [2] [a] [ii]; [e]); (2) adverse impacts upon the environment would be minimized and the facility would be compatible with public health and safety by virtue of the certificate terms set forth in the Siting Board approval order and the terms of permits issued by other agencies, including the DEC requirement concerning the use of dry cooling technology (*see*, Public Service Law § 168 [2] [c] [i], [ii]); (3) the plant's effect on the area's visual resources would be mitigated by lowering the emission stack and cooling tower to 180 feet and 90 feet, respectively, and using dry cooling to eliminate steam plumes (*see*, Public Service Law § 168 [2] [b]); and (4) certain waivers from the Town's zoning ordinances were required (*see*, Public Service Law § 168 [2] [d]). Petitioners' subsequent application for a rehearing was denied and this CPLR article 78 proceeding ensued.

As a threshold matter, we agree with respondents that certain of petitioners' claims were not effectively raised in the administrative forum and therefore are not preserved for our consideration. First, the record indicates that petitioners Janessa Nisely and Jay Carlisle raised none of their present contentions before the Siting Board or DEC as they never filed briefs, took exceptions to the September 1999 recommended decision or sought party status in connection with the SPDES permit application. We are unpersuaded by petitioners' argument that every issue raised in the petition for rehearing is subject to review by this Court by virtue of Public Service Law § 170 (1), which establishes an application for rehearing as a prerequisite for judicial review. Overlooked by petitioners' analysis is the regulatory requirement that a party take exception to the recommended decision as a prerequisite to raising arguments in a petition for rehearing (*see*, 16 NYCRR 4.10 [d] [2], applicable to proceedings under Public Service Law article X by virtue of 16 NYCRR 1000.1). We shall, nonetheless, consider

the contentions of all petitioners raising arguable constitutional issues and the further contentions advanced by petitioner as have been preserved for our consideration.

On the merits, we first reject the contention that the Siting Board approval order's waiver of certain requirements of the Town zoning ordinance pursuant to Public Service Law § 168 (2) (d) violates the home rule provisions of the State Constitution. Those provisions empower the Legislature to enact "general law[s]" affecting the property, affairs or government of any local government (*see,* NY Const, art IX, § 2 [b] [2]). Notably, "where State interests are involved 'to a substantial degree, in depth or extent' the State may freely legislate without home rule approval, notwithstanding the legislation's impact on local concerns" (*City of New York v State of New York,* 94 NY2d 577, 590, quoting *Wambat Realty Corp. v State of New York,* 41 NY2d 490, 494). Contesting none of that, petitioners nonetheless contend that a distinction need be drawn between new power facilities serving a demonstrated electric capacity need, which fulfill a State-wide interest, and all other new power facilities, which fulfill no such interest. According to petitioners, local zoning ordinances may be permissibly overridden in the case of the former but not the latter.

We disagree. The test of whether a statute addresses a matter of State-wide concern cannot be determined through subjective analysis on a case-by-case basis. To the contrary, a statute qualifies as a "general law" if it "in terms and in effect applies alike to * * * all cities, all towns or all villages" (NY Const, art IX, § 3 [d] [1]; *see, Matter of City of Utica [Zumpano],* 91 NY2d 964). Consistent with that view, comprehensive regulatory schemes relating to the siting of public utilities have been found to qualify as a "general law" preempting local zoning ordinances (*see, Consolidated Edison Co. v Town of Red Hook,* 60 NY2d 99, 107 [siting of major steam powered generating facility]; *Matter of Skyview Acres Coop. v Public Serv. Commn.,* 163 AD2d 600, 603-604, *appeal dismissed* 76 NY2d 1017, *lvs denied* 77 NY2d 805, 806 [siting of natural gas pipeline]).

We also reject the contention that the phrase "unreasonably restrictive" contained in Public Service Law § 168 (2) (d)* is

---

* Public Service Law § 168 (2) (d) provides in pertinent part:

"the [siting] board may refuse to apply any local ordinance, law, resolution or other action or any regulation issued thereunder or any local standard or requirement which would be otherwise applicable if it finds that as applied to the proposed facility such is *unreasonably restrictive in view of the existing*

unconstitutionally vague. In their analysis, petitioners ignore the qualifying language of the statute, i.e., "in view of the existing technology or the needs of or costs to ratepayers whether located inside or outside of such municipality" (Public Service Law § 168 [2] [d]). In our view, as so qualified, the statutory language provides a sufficient objective standard for making a determination as to whether a local ordinance is "unduly restrictive" (*see, Consolidated Edison Co. v Town of Red Hook, supra*, at 106-108; *Matter of Skyview Acres Coop. v Public Serv. Commn., supra*, at 603).

■ We now turn to the question of whether AGC's proposed facility was selected pursuant to an "approved procurement process." Under Public Service Law article X, the Siting Board must find that (1) construction of the facility is reasonably consistent with the policies and long-range energy planning objectives and strategies contained in the most recent State Energy Plan or (2) the facility was selected pursuant to an approved procurement process (*see*, Public Service Law § 168 [2] [a] [i], [ii]). According to petitioner, competitive bidding is the sole approved procurement process and, as no competitive bidding was involved in this case, the Siting Board's determination that the facility was selected pursuant to an approved procurement process is erroneous as a matter of law.

Again, we disagree. In our view, the Siting Board had a rational basis for determining that the facility was selected pursuant to an approved procurement process. As applied to the present application, Public Service Law § 160 (7) defines "approved procurement process" as "any electric capacity procurement process approved by [the Department of Public Service] * * * as reasonably consistent with the most recent state energy plan adopted pursuant to [Energy Law article 6]." Under Public Service Law § 66-i, the Department of Public Service has "authority to require each electric corporation to conduct competitive bidding auctions *or other procurement programs* for the purpose of satisfying electric capacity needs from reasonably available sources and suppliers of electric capacity * * * to prescribe guidelines, rules and regulations regarding the participation of utility companies, their affiliates, subsidiaries and any other corporation or person in competitive bidding auctions, *or regarding any other method of acquiring*

*technology or the needs of or costs to ratepayers whether located inside or outside of such municipality*" (emphasis supplied).

*electric capacity*" (Public Service Law § 66-i [2], [3] [emphasis supplied]). Even more to the point, Public Service Law § 66-i (4) specifically provides as follows:

> "Nothing in this section shall be construed to require the [Department of Public Service] to order the use of a competitive bidding auction, or to preclude [it] from allowing or requiring a capacity addition set-aside, incentive rates or other forms of rate treatment, or a separate auction or program, to encourage investments in demand-reducing measures, renewable energy sources, or other energy sources reasonably consistent with the state energy plan."

Pursuant to that authority, by declaratory ruling issued April 16, 1998, the Department of Public Service declared that competition in the electricity supply market is an approved procurement process consistent with the 1994 State Energy Plan. By further declaratory ruling issued August 25, 1999, the Department of Public Service updated its determination to hold that competition is also reasonably consistent with the 1998 State Energy Plan, the one in effect at the time of the current application. In our view, petitioner's belated collateral attack on those rulings is unavailing.

■ We also reject the contention that the Siting Board erred in its determination that AGC was not required to describe and evaluate alternative sites pursuant to Public Service Law § 164 (1) (b). To the contrary, we conclude that the Siting Board rationally determined that a private applicant, lacking the power of eminent domain, cannot be required to present alternative sites that it neither owns nor has an option to purchase. DEC rules under the State Environmental Quality Review Act (ECL art 8), applicable to Public Service Law article X proceedings by virtue of Public Service Law § 164 (1) (b), specify that "[s]ite alternatives may be limited to parcels owned by, or under option to, a private project sponsor" (6 NYCRR 617.9 [b] [5] [v]; *see,* 16 NYCRR 1001.2 [d] [2]; *Matter of Schodack Concerned Citizens v Town Bd.,* 148 AD2d 130, 135, *lv denied* 75 NY2d 701; *Horn v International Bus. Machs. Corp.,* 110 AD2d 87, 95-96, *lv denied* 67 NY2d 602). Further, although the Siting Board permitted petitioner to offer evidence of alternative sites on the issue of whether the plant is in the public interest, the record supports its conclusion that the

alternatives offered by petitioner had problems of their own and that "[t]here has been no showing that there is an available, preferable site that should be developed instead of the site proposed by AGC."

■ Finally, there is substantial evidence in the record to support the Siting Board's conclusion that, considering the environmental impacts, the construction and operation of the facility is in the public interest (Public Service Law § 168 [2] [e]). Most notably, the record does not support petitioner's contention that construction of the facility will unreasonably impact the viewshed from Olana, the renowned estate of Frederic Church, leader of what was to become known as the Hudson River School of landscape painting. As noted in the Hearing Examiners' decision, "[n]o issue has received more attention in this proceeding than the visual impact of the proposed generating plant," and the Hearing Examiners devoted more than 80 pages of their voluminous decision to that topic, with 26 pages dedicated to visual impacts on Olana alone.

We would first note that the record belies petitioner's representation that the proposed facility is "directly across the Hudson River from Olana." To the contrary, the facility is situated on the opposite side of the river, approximately 3.1 miles north of Olana and two miles inland. The distinction is significant because expert testimony indicated, and the Siting Board found, that the proposed facility would be located in Olana's north/northwest viewshed. Views in that direction "offer a basically flat horizon in the distance, and encompass a section of the Hudson River Valley in the foreground which includes topographic and land use features that are not unusual or extraordinary." The renowned views to the southwest are unaffected.

AGC commissioned a visual impact study of the proposed facility which, consistent with the Visual Resources Assessment Procedure issued by the Army Corps of Engineers, was designed to assess the potential visibility of the proposed energy facility and its ancillary structures by comparing the differences in the landscape with and without the above-ground components of the project in place. Throughout the review, the proposed height of the three combustion turbine emission stacks was reduced from 225 to 213 and, ultimately, to 180 feet. One hundred and eighty-foot stacks not only eliminated the need for obtrusive aviation warning lights, but substantially reduced the degree to which the facility could be seen from distant points. In addition, the ultimate decision to utilize dry

cooling technology not only minimized impacts on the Hudson River but provided the further benefit of essentially eliminating visible stack plumes, a very significant mitigation measure in light of the focus groups' conclusion that stack plumes represented the most significant visual impact of the facility. Based upon the voluminous record before it, the Siting Board ultimately concluded that "the probable visual impact of the proposed facility would be slight, and that such impact would not be significantly adverse to the interests and areas of concern identified in [Public Service Law] § 168 (2)." In our view, that conclusion has abundant support in the record.

■ The record also supports the Siting Board's determination that the plant would contribute to competition, thereby lowering electricity prices, displace less efficient plants, provide a reliable source of electricity at a time when there are projected energy shortfalls and relieve transmission constraints. Evidence also established that, as a modern natural gas fueled facility, certain noxious gas levels would be reduced and the use of dry cooling technology would result in fewer fish kills because production will be displaced from other Hudson River power plants that draw more water and, therefore, kill more fish. Petitioner's speculation that AGC intends to market its electricity in New England lacks support in the record and, at most, raised a credibility issue that the Siting Board was entitled to resolve in favor of AGC (*see, Matter of Lane Constr. Corp. v Cahill*, 270 AD2d 609, 611, *lv denied* 95 NY2d 765). Further, the record indicates that the plant was required as a condition of approval to submit to the New York Independent System Operation (hereinafter NYISO) for the dispatch of electricity. Thus, even if the plant's electricity were to be sold outside the State, transmission of the electricity through NYISO would commit generators to minimize costs and maintain reliability and the overall amount of electricity produced in the State would be increased, thereby resulting in lower electricity prices.

Petitioners' remaining contentions are either unpreserved for our consideration, need not be considered or have been considered and found to be unavailing.

PETERS, SPAIN, CARPINELLO and ROSE, JJ., concur.

Adjudged that the determination is confirmed, without costs, and petition dismissed.