■ In the Matter of CITY OF NEW YORK, Petitioner, v TRANS-GAS ENERGY SERVICES CORPORATION, Respondent. [824 NYS2d 138]—

Proceeding pursuant to EDPL 207 to review a determination of TransGas Energy Services Corporation, dated August 6, 2005, made after a public hearing, to acquire a parcel of real property for the purpose of constructing and operating a 1,100-megawatt electric and steam cogeneration plant.

Adjudged that the petition is granted, on the law, without costs or disbursements, and the determination is annulled.

In October 1998 Brooklyn Community Board 1 submitted plans to the New York City Planning Commission (hereinafter CPC), pursuant to New York City Charter § 197-a, for a major rezoning of the Brooklyn East River waterfront in the neighborhoods of Greenpoint and Williamsburg. The plans were created in response to the decline in manufacturing activity and a corresponding increase in residential demand in the area, and sought to preserve some areas of manufacturing while creating extensive public access to the currently industrial waterfront. As such, the plans included, as their centerpiece, a 28-acre park on the waterfront below the Bushwick Inlet. The plans were approved by the CPC on December 5, 2001, and December 19, 2001, and by the New York City Council (hereinafter the City Council) on January 25, 2002, and January 30, 2002.

Meanwhile, in March 2001, a corporation named Gas Alternative Systems, Inc. (hereinafter Gas), purchased an option to buy the subject property, and in December 2002, an affiliate of Gas, TransGas Energy Systems (hereinafter TGE), filed an application with the New York State Board on Electric Generation Siting and the Environment (hereinafter the Siting Board), pursuant to Public Service Law former article X, to construct and operate a 1,100-megawatt electric and steam cogeneration plant on the subject property. The City participated in the hearings and briefings on TGE's application, and maintained its opposition to the plant on the ground that it was incompatible with the proposed rezoning and park.

In June 2003, on the basis of, and substantially consistent with, the New York City Charter § 197-a plans, the New York City Department of City Planning (hereinafter the DCP) released the Greenpoint-Williamsburg Land Use and Waterfront Plan for rezoning the Brooklyn East River waterfront. On April 23, 2004 the DCP filed a land use review application for the rezoning. On March 4, 2005 the CPC issued a final environmen-

tal impact statement which described the environmental impacts of the rezoning, and determined that any significant adverse environmental impacts would be mitigated. On March 14, 2005 the CPC approved the application and the acquisition of land necessary for creating the park. On May 11, 2005 the City Council substantially confirmed the CPC's determination.

On June 8, 2005 TGE's principal shareholder Adam Victor formed, and became the sole shareholder of, a new corporation named TransGas Energy Services Corporation (hereinafter TESC), pursuant to Transportation Corporations Law article 2, in order to acquire the power of eminent domain under that statute. TESC's corporate purpose is identical to that of TGE, namely, to construct and operate the TGE power plant on the Brooklyn East River waterfront.

On July 7, 2005, while TGE's Public Service Law former article X application was still pending, TESC commenced a condemnation proceeding to acquire the property, pursuant to Eminent Domain Procedure Law article 2, by holding a public hearing, inter alia, to review the public use and environmental impact of the project.

On July 20, 2005 the City commenced its own proceeding, pursuant to the EDPL to condemn the subject property (see Matter of City of New York, 10 Misc 3d 1060[A], 2005 NY Slip Op 52047[U] [2005]). TGE, TESC, and Gas moved to dismiss the City's proceeding on the ground, inter alia, that the Siting Board had exclusive jurisdiction over the siting of power plants (id.). The Supreme Court agreed, determining that any action by the City that might undermine the determination of the Siting Board was preempted by Public Service Law former article X (id.). Accordingly, the Supreme Court stayed the City's condemnation proceeding pending the Siting Board's final determination (id.).

On August 6, 2005 TESC published its determination and findings, pursuant to EDPL 204, in which it determined that the facility would serve a public purpose by, among other things, lowering the cost of electricity and improving the reliability and recovery time of the City's power grid. The determination and findings also concluded that the facility would not have a significant impact on the environment. In response, the City commenced the instant proceeding pursuant to EDPL 207, to review the determination and findings on the grounds that TESC failed to comply with the State Environmental Quality Review Act (hereinafter SEQRA), that it erroneously concluded that the project served a public purpose, and that it was incompatible with TGE's pending Public Service Law former article X application.

The question presented in this case is whether a party which has applied for permission to construct and operate a major electric generating facility pursuant to Public Service Law former article X may simultaneously commence a condemnation proceeding pursuant to the EDPL, and publish a determination and findings pursuant to EDPL article 2. We answer in the negative.

In *Consolidated Edison Co. of N.Y. v Town of Red Hook* (60 NY2d 99, 105 [1983]), the Court of Appeals held that, in enacting Public Service Law article VIII, the predecessor to Public Service Law article X, "[t]he purpose . . . was expressly 'to provide for the expeditious resolution of all matters concerning the location of major steam electric generating facilities presently under the jurisdiction of multiple state and local agencies, including all matters of state and local law, in a single proceeding' (L 1972, ch 385, § 1)." This Court has also noted that, "Public Service Law article X was enacted in 1992 to provide 'a comprehensive framework for developing and implementing sound energy policy for the State that integrates energy planning with consideration of environmental quality and [to provide] a one-stop process for the siting of major electric generating facilities' " (*Matter of New York Inst. of Legal Research v New York State Bd. on Elec. Generation Siting & Envt.,* 295 AD2d 517, 518 [2002], quoting Governor's Mem approving L 1992, ch 519, 1992 NY Legis Ann, at 323). In *Matter of Citizens for Hudson Val. v New York State Bd. on Elec. Generation Siting & Envt.* (281 AD2d 89, 92 [2001]), the Appellate Division, Third Department, noted that, "Public Service Law article X . . . provides for a comprehensive review of environmental and public interest impacts and the issuance of a certificate of environmental compatibility and public need as a precondition to the siting of a major electric generating facility . . . Ultimate authority for the prescribed review and issuance of a certificate is invested in [the Siting Board], within the Department of Public Service" (citations omitted). While Public Service Law article X was allowed to expire on December 31, 2002, the law provided that any applications filed before the expiration date would continue to be reviewed thereunder (*see* L 1999, ch 636). Therefore, because TGE's application was filed in December 2002, it was subject to Public Service Law article X.

The comprehensive and exclusive jurisdiction of the Siting Board over matters related to a Public Service Law article X application is also evident in the interplay between Public Service Law article X, the EDPL, and SEQRA. Public Service Law for-

mer § 162 requires a party seeking to construct a major electric generating facility to first obtain a certificate of environmental compatibility and public need from the Siting Board. Public Service Law former §§ 164 and 165 provide for hearings at which the affected municipality may be represented, and Public Service Law former § 168 permits the Siting Board to issue a certificate only if it determines, inter alia, that the facility minimizes adverse environmental impacts and is in the public interest. Public Service Law former § 170 (1) provides for a rehearing on the Siting Board's decision and, following that, for judicial review in an original proceeding in the Supreme Court, Appellate Division. Significantly, however, Public Service Law former § 171 provides, in relevant part, that "no court of this state shall have jurisdiction to hear or determine any matter, case or controversy concerning any matter which was or could have been determined in a proceeding under this article . . . except to enforce compliance with this article or the terms and conditions issued thereunder."

EDPL article 2 requires a potential condemnor to conduct a public hearing and publish its determinations and findings on the public purpose and environmental impact of the proposed condemnation. However, EDPL 206 (B) provides that, "[t]he condemnor shall be exempt from compliance with the provisions of this article when . . . it obtained a certificate of environmental compatibility and public need." While EDPL 207 (C) (3) provides for judicial review of, inter alia, whether "the condemnor's determination and findings were made in accordance with [SEQRA]," Environmental Conservation Law § 8-0111 (5) (b) provides, in relevant part, that "the requirements of [ECL 8-0109 (2)] [preparation of an environmental impact statement] shall not apply to . . . [a]ctions . . . requiring a certificate of environmental compatibility and public need in articles seven and eight of the public service law," and 6 NYCRR 617.5 (c) (35) provides, in relevant part, that "actions requiring a certificate of environmental compatibility and public need under . . . article . . . X of the Public Service Law . . . are not subject to review under [ECL article 8]."

EDPL article 4 permits a condemnor that has complied with the above-cited articles to commence a proceeding in the Supreme Court to acquire title to, and possession of, the subject property. EDPL 401 (A) (2) provides that, "[t]he condemnor may commence proceedings under this article . . . after . . . [issuance of] the order or completion of the procedure that constitutes the basis of exemption under [section 206]." Significantly, however, EDPL 402 (B) (3) (g) requires that, in order to initiate

an EDPL article 4 proceeding, "if the property is to be used for the construction of [a] facility . . . with respect to which a certificate of environmental compatibility and public need has been issued [the condemnor shall verify] that such certificate . . . has been issued and is in force."

In light of the comprehensive and exclusive jurisdiction of the Siting Board over matters related to Public Service Law article X applications, we hold that, where a party has applied for permission to construct and operate a major electric generating facility pursuant to Public Service Law article X, it may not commence a condemnation proceeding pursuant to the EDPL unless and until it receives a certificate of environmental compatibility and public need from the Siting Board, and the determination of the Siting Board supersedes and obviates a determination and findings made pursuant to EDPL article 2. Therefore, TESC's determination and findings are void, as a matter of law, and this Court lacks subject matter jurisdiction to review the merits thereof (cf. *Editorial Photocolor Archives v Granger Collection,* 61 NY2d 517 [1984]). Accordingly, the petition should be granted, and the determination should be annulled. Schmidt, J.P., Santucci, Fisher and Covello, JJ., concur.