Matter of Broome County Concerned Residents v New York State Bd. on Elec. Generation Siting & the Envt. (2021 NY Slip Op 05903)





Matter of Broome County Concerned Residents v New York State Bd. on Elec. Generation Siting & the Envt.


2021 NY Slip Op 05903


Decided on October 28, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:October 28, 2021

531357

[*1]In the Matter of Broome County Concerned Residents et al., Petitioners,
v
New York State Board on Electric Generation Siting and the Environment et al., Respondents, et al., Respondents.

Calendar Date:September 14, 2021

Before: Garry, P.J., Aarons, Pritzker, Reynolds Fitzgerald and Colangelo, JJ.


The Zoghlin Group, PLLC, Rochester (Benjamin E. Wisniewski of counsel), for petitioners.
Robert Rosenthal, Public Service Commission, Albany (John C. Graham of counsel), for New York State Board on Electric Generation Siting and the Environment, respondent.
Young/Sommer LLC, Albany (William A. Hurst of counsel), for Bluestone Wind, LLC, respondent.


Pritzker, J.
Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Public Service Law § 170 [1]) to review a determination of respondent State Board on Electric Generation Siting and the Environment granting an application by respondent Bluestone Wind, LLC for a certificate of environmental compatibility and public need to construct a wind farm.
Public Service Law article 10 provides for a comprehensive review of environmental and public interest impacts and the issuance of a certificate of environmental compatibility and public need as a precondition to the siting of a major electric generating facility within the state (see Public Service Law §§ 160 [2]; 162). Ultimate authority for this review is delegated to respondent State Board on Electric Generation Siting and the Environment (hereinafter the Siting Board) within the Department of Public Service (hereinafter DPS) (see Public Service Law § 160 [4]). In October 2016, respondent Bluestone Wind, LLC (hereinafter Bluestone) submitted to DPS a notice of intent seeking a certificate to construct the Bluestone Wind Farm Project — an approximately 125-megawatt wind powered electric generating facility with a proposed location in the Town of Sanford (hereinafter the Town) and the Town of Windsor, both in Broome County. This was accompanied by Bluestone's preliminary Public Involvement Program Plan (hereinafter PIP). As initially proposed, the project included the construction and operation of up to 40 wind turbines. The October 2016 PIP noted that Bluestone had already begun engaging with stakeholders, including the Town, regarding the project plans. Following a review and in consideration of recommendations from DPS staff, Bluestone submitted a revised PIP in December 2016.
In January 2017, the Sanford Town Board adopted Local Law No. 1-2017 of the Town of Sanford (hereinafter Local Law No. 1) amending the Town's Land Use Management Local Law and setting forth regulations for the design, siting and installation of renewable energy systems, including wind energy conversion systems. In its subsequent application to the Siting Board, submitted in September 2018, Bluestone outlined the various local laws and ordinances that could impact the project. As relevant here, Bluestone stipulated, after consulting with the Town, to the applicability of Local Law No. 1 in regard to both its procedural and substantive requirements. Bluestone expressly noted that "[t]he location of the proposed [f]acility will conform to all such local substantive requirements" and that, as such, it was not requesting that the Siting Board grant any waivers for provisions of local law.
The Siting Board deemed Bluestone's application complete on December 27, 2018, thus triggering a statutorily imposed one-year period for it to render a determination (see Public Service Law § 165 [4] [a]). As part of its application, Bluestone submitted a required intervenor fee of $124,000, "to be disbursed at the [Siting [*2]Board's] direction, to defray expenses incurred by municipal and other local parties to the proceeding . . . for expert witness, consultant, administrative and legal fees" (Public Service Law § 164 [6] [a]; see Public Service Law § 163 [4] [a]). Upon each of their timely requests, this funding was distributed among the Town, the Town of Windsor, petitioner Delaware-Otsego Audubon Society, Inc. (hereinafter DOAS) and petitioner Broome County Concerned Residents (hereinafter BCCR) (see Public Service Law § 164 [6] [b]). Administrative Law Judges from the Department of Environmental Conservation (hereinafter DEC) and DPS were appointed to serve as Hearing Examiners. Following prefiled testimony on all issues, hearings were held over a period of three days, from July 9 through 11, 2019.
After the evidentiary hearing was closed, on August 13, 2019, the Sanford Town Board approved Local Law No. 2-2019 of the Town of Sanford (hereinafter Local Law No. 2) affecting a temporary, three-month moratorium within the Town on the development and construction of wind energy conversion systems "so as to allow the Town time to study the potential impacts, effects, and possible controls over such activities." Considering this development, BCCR — but not the Town — filed a motion with the Siting Board to stay the proceedings for three months. The Hearing Examiners denied said motion, finding that it was statutorily bound to render a decision within 12 months of Bluestone's application (see Public Service Law § 165 [4] [a]).
In October 2019, the Hearing Examiners issued a recommended decision to the Siting Board which, in part, took judicial notice of Local Law No. 2, but determined that it was a procedural law that was inapplicable to the proceeding. Ultimately, the Hearing Examiners recommended that the Siting Board grant Bluestone a conditional certificate for the project, subject to a number of specified terms. Nearly all involved parties in opposition to the project — notably, excluding the Town — then filed briefs on exception in October 2019. Following the completion of this briefing process, the Sanford Town Board approved Local Law No. 3-2019 of the Town of Sanford on November 12, 2019, extending the moratorium created in Local Law No. 2 until the earlier of either its repeal or March 1, 2020.
On December 9, 2019, the Siting Board issued a press release indicating that it would meet on December 16, 2019 to consider Bluestone's application. On December 11, 2019, BCRR (again, not the Town) notified the Siting Board that the Town had adopted a new superseding local law regulating, among other things, wind energy generating facilities. On December 13, 2019, the Town submitted a letter indicating that it had approved and filed, on that same date, Local Law No. 4-2019 of the Town of Sanford (hereinafter Local Law No. 4).[FN1] The Town did not otherwise comment on Local Law No. 4, which superseded Local Law No. 1 and imposed substantial additional restrictions [*3]on wind energy converting systems. Nonetheless, the Siting Board convened on December 16, 2019 and granted Bluestone's application and issued the certificate, subject to nearly 150 conditions. Petitioners thereafter filed separate applications for rehearing, both of which were denied by the Siting Board. Petitioners then commenced this CPLR article 78 proceeding in this Court in May 2020 and filed an amended petition in August 2020 seeking, among other things, an order vacating the Siting Board's grant of the certificate to Bluestone, reopening the record in the proceeding for further adjudication of issues and enjoining Bluestone from engaging in further construction on the project until the matter is fully decided.[FN2]
We turn first to petitioners' related contentions that the Siting Board failed to consider Local Law No. 4 and that the Siting Board erred in refusing to grant a six-month extension to reopen the hearing to accomplish same.[FN3] As a threshold matter, although Public Service Law article 10 expressly preempts all local procedural laws (see Public Service Law § 172 [1]; 16 NYCRR 1001.31 [a]) with respect to substantive local requirements, the Siting Board cannot grant a certificate unless it determines, with certain exceptions, that "the facility is designed to operate in compliance with applicable state and local laws and regulations issued thereunder concerning, among other matters, the environment, public health and safety" (Public Service Law § 168 [3] [e]; see 16 NYCRR 1001.31 [d]). Thus, article 10 unmistakably directs that substantive local laws be considered; however, how such laws are considered is carefully set forth and intertwined within the regulatory provisions, reflecting the overall legislative intent. To that end, the Siting Board may elect "not to apply, in whole or in part, any local ordinance, law, resolution or other action or any regulation issued thereunder . . . which would be otherwise applicable if it finds that, as applied to the proposed facility, such is unreasonably burdensome in view of the existing technology or the needs of or costs to ratepayers whether located inside or outside of such municipality" (Public Service Law § 168 [3] [e]). Notably, a municipality "seeking to enforce any local ordinance, law, resolution or other action or regulation otherwise applicable shall present evidence in support thereof or shall be barred from the enforcement thereof" (Public Service Law § 166 [1] [j]). Ultimately, the Siting Board must make a final decision "upon the record made before the presiding examiner" (Public Service Law § 168 [1]). Moreover, all "proceedings on an application shall be completed in all respects . . . including a final decision by the [Siting Board], within [12] months from the date of a determination by the chair that an application" is complete (Public Service Law § 165 [4] [a]). However, the Siting Board "may extend the deadline in extraordinary circumstances by no more than six months [*4]in order to give consideration to specific issues necessary to develop an adequate record" (Public Service Law § 165 [4] [a]).
Here, the Siting Board first received notice of Local Law No. 4 from BCCR by way of a letter on December 11, 2019, which informed the Siting Board of the law's adoption. Based on this development, BCCR moved for an extension of the statutory deadline and adjournment of the meeting scheduled for December 16, 2019 — at which the Siting Board was expected to render a decision on the matter. BCCR argued that the enactment of Local Law No. 4 was "not a last minute attempt by [the Town] to delay or obstruct the Siting Board," but rather that the Town had "worked diligently to amend its law for the last [eight] months." BCCR asserted that, because the Town amended its law before the final decision was rendered, the Siting Board was "bound to apply the substantive provisions of the law, or upon sufficient evidentiary showing, waive them." After BCCR submitted this letter, the Town filed a copy of Local Law No. 4 with the Siting Board, noting in its submission that it was doing so "[t]o inform the administrative record." The Town did not, however, take a position on BCCR's motion to extend the statutory deadline and adjourn the December 16, 2019 meeting.
In its order granting Bluestone the certificate, the Siting Board determined that it was "foreclosed under [Public Service Law] § 168 (1) from examining" Local Law No. 4 [FN4] given that it was "passed after the close of the evidentiary hearing and thus [was] not available or reviewed by the parties during the evidentiary phase of this proceeding or during post-hearing briefing." Specifically, Public Service Law § 168 (1) provides that the Siting Board "shall make [a] final decision on an application under [article 10] for a certificate . . . upon the record made before the presiding examiner" (emphasis added). The Siting Board interpreted the Legislature's use of the word "shall" in the statute to "indicate[] its intent to create a static point in time when the record is closed." Explaining that it did "not come to this part of [its] decision lightly," the Siting Board further reasoned that, although the Town was a party to the case, received intervenor funding and "was afforded an opportunity to present evidence in support of its local laws, it never took a position regarding whether the [p]roject complies with local laws" nor took exception to the recommended decision, including the finding therein that the project complied with all local laws. Accordingly, the Siting Board found that "the [p]roject complies with all local laws at issue when the record closed on July 11, 2019." The Siting Board went on to deny BCCR's request to extend the statutory deadline "for failure to make the requisite showing of 'extraordinary circumstances.'" Although the Siting Board's order ultimately granted Bluestone a certificate, the Town did not thereafter file or join in a petition for [*5]rehearing on the decision.
Here, the Siting Board acted rationally in determining that the consideration of local laws included only those laws in effect before the closing of the record and that reopening the record was unwarranted. The legislative history and intent fully support this decision. In enacting the predecessor to Public Service Law article 10, the Legislature acted with the express purpose of providing "'for the expeditious resolution of all matters concerning the location of major steam electric generating facilities presently under the jurisdiction of multiple state and local agencies, including all matters of state and local law, in a single proceeding'" (Consolidated Edison Co. of N.Y. v Town of Red Hook, 60 NY2d 99, 105 [1983], quoting L 1972, ch 385, § 1). In its current iteration, article 10 "was enacted in 1992 to provide 'a comprehensive framework for developing and implementing sound energy policy for the [s]tate that integrates energy planning with consideration of environmental quality and [to provide] a one-stop process for the siting of major electric generating facilities'" (Matter of New York Inst. of Legal Research v New York State Bd. on Elec. Generation Siting & Envt., 295 AD2d 517, 518-519 [2002], quoting Governor's Mem approving L 1992, ch 519, dated July 24, 1992, 1992 NY Legis Ann at 323). "One goal of the legislation was to permit comprehensive review of the benefits and impacts anticipated from proposed facilities without unreasonable delay [and,] . . . [i]ndeed, the expeditious resolution of siting applications is a goal noted throughout documents submitted in support of the legislation" (id. [internal quotation marks and citations omitted]).
This goal was manifested in the 12-month deadline imposed on the Siting Board to issue a final determination on each application before it (see id. at 519; see also Public Service Law § 165 [4]). To permit the Siting Board to maintain this timeline, the statute specifies that it must base its decision "upon the record made before the presiding examiner" (Public Service Law § 168 [1]). Notably, Public Service Law article 10 requires the inclusion of all substantive local laws in the record by way of a specific exhibit to be incorporated into each application (see Public Service Law § 164 [1] [b] [v]; 16 NYCRR 1001.31 [d]). Any disputes as to whether a proposed facility complies with a local substantive law are thus intended to be resolved by way of evidence presented during the hearing to the Hearing Examiners, and the statute explicitly places the burden on the municipality to present evidence in support of enforcement of the local law in question (see Public Service Law § 166 [1] [j]). "Thus, the history and scope of article [10], as well as its comprehensive regulatory scheme, . . . would be frustrated by" last minute laws such as Local Law No. 4 (Consolidated Edison Co. of N.Y. v Town of Red Hook, 60 NY2d at 106).
In this case, the purpose and resulting [*6]nature of the statutory scheme weigh in favor of rejecting for consideration a substantive local law passed well after the close of the evidentiary record and the Hearing Examiners' recommended decision, and in fact did not take effect until the same day that the Siting Board issued its determination. To force the Siting Board to remand the matter to the Hearing Examiners for further consideration at that point in the process would no doubt run afoul of the statutory deadline and be contrary to the statute's intended purpose of providing a timely decision in the matter. Significantly, as both Bluestone and the Siting Board now caution, to find otherwise would provide leeway for municipalities in future Public Service Law article 10 proceedings to prolong or waylay the process by approving more stringent substantive laws well into the review period. Such a result would be contrary to the very goals and spirit of article 10 by permitting last minute local lawmaking as a tactic to thwart unpopular or unwanted projects and undermine the authority and control of the Siting Board. Given these various factors, the Siting Board's determination that it could not consider Local Law No. 4 was "realistic and reasonable" in light of the significance placed upon the expeditious resolution of applications brought under article 10 and the accompanying 12-month deadline (Matter of UPROSE v Power Auth. of State of N.Y., 285 AD2d 603, 606 [2001]).
This is not to say that the Siting Board is foreclosed from granting an application to reopen a hearing to consider local legislation that is effective after the close of an evidentiary hearing but before it renders its decision, provided "extraordinary circumstances" exist (see Public Service Law § 165 [4] [a]). Here, however, additional facts weigh in favor of the Siting Board's further determination that extraordinary circumstances did not exist warranting an extension. One such fact is that the Town had ample notice of the proceeding and was actively involved therein, yet failed to present evidence in support of the enforcement of Local Law No. 4 or otherwise move the Siting Board to consider it at such a late stage in the process. This fact, as well as the Town's failure to take exception to the recommended decision, provide ample support for the Siting Board's determination not to extend the proceeding. Notably, the Town itself did not seek such an extension in light of its approval of Local Law No. 4, nor did it make any attempt to demonstrate the requisite extraordinary circumstances necessary to succeed on such a request (see Public Service Law § 165 [4] [a]). Regardless, given the Town's unexplained delay in enacting Local Law No. 4, despite its longstanding knowledge of and participation in the proceeding, the Siting Board did not abuse its discretion in finding that there were not any extraordinary circumstances warranting an extension. Finally, even if an extension had been granted, there is nothing [*7]to indicate that the additional time, which could not be more than six months (see Public Service Law § 164 [4] [a]), would have been sufficient to account for all of the substantive provisions of Local Law No. 4.
Next, petitioners contend that the Hearing Examiners violated the State Administrative Procedures Act (hereinafter SAPA) because they allegedly deprived the intervenors the opportunity to be heard by excluding evidence, withholding the opportunity to cross-examine witnesses, striking written submissions from the record and depriving DOAS of its choice of representation during the evidentiary hearing. SAPA provides that any person appearing before an agency "shall be accorded" the right to be represented by counsel, and that such representation need not be by a lawyer (State Administrative Procedure Act § 501). In addition, all parties to an administrative proceeding "shall be afforded an opportunity to present written argument on issues of law and an opportunity to present evidence and such argument on issues of fact" (State Administrative Procedure Act § 301 [4]). However, "[b]riefs and other documents that attempt to persuade through argument are not evidence and may not be entered into the evidentiary record of a proceeding" (16 NYCRR 1000.12 [a] [9]). Further, "[a]n administrative hearing officer is not bound by traditional rules of evidence and may adopt his or her own procedures for the admission of evidence, so long as a party's interests are not prejudiced thereby" (Matter of Flynn v Hevesi, 308 AD2d 674, 676 [2003] [internal quotation marks, brackets and citation omitted], lv denied 1 NY3d 504 [2003]). This Court's review of such issues is limited to "whether the [h]earing [o]fficer's decision amounted to an abuse of discretion" (id.). As further relevant here, in the context of Public Service Law article 10, "[a]ll testimony and information presented by the applicant, any state agency or other party shall be subject to discovery and cross-examination" (Public Service Law § 167 [1] [b]).
Here, petitioners challenge multiple procedural and evidentiary rulings occurring between July and September 2019.[FN5] One such ruling was the Hearing Examiners' refusal to allow Heather D. DeHaan, a member of DOAS, to represent Thomas Salo, a DOAS witness. By way of background, DOAS was represented at the hearing by Andrew Mason, co-president of DOAS, but, on the day of Salo's cross-examination, Mason was not available. The hearing transcript reveals that, the day prior to Salo's cross-examination, DOAS knowingly agreed to proceed with Salo's testimony without Mason being present. Thus, DOAS has waived any argument relative to proceeding with Salo's testimony in Mason's absence. Petitioners' remaining challenges to the Hearing Examiners' evidentiary rulings include the exclusion of draft lease agreements between Bluestone and local landowners. The Hearing Examiners found these agreements to be irrelevant to the proceeding (see 16 NYCRR [*8]1000.12 [a] [2]), as there had been no showing that they provided reliable evidence of the actual contracts adopted and, further, because BCCR had no standing, organizational or otherwise, to assert the rights of private individuals who had entered into contracts with Bluestone. Not only was this determination rational, but petitioners do not put forth any arguments as to how they were prejudiced by this determination and, indeed, it is difficult to imagine how the exclusion of these documents could rise to such a level of prejudice to constitute an abuse of discretion (compare Matter of Anderson v McCall, 294 AD2d 740, 741 [2002]). Finally, contrary to petitioners' assertions, the Hearing Examiners' determination to strike BCCR's proffer, in its posthearing brief, of letters from an acoustician challenging various aspects of Bluestone's analysis of the potential noise impacts of the project following the close of the record protected the other parties' rights and ensured compliance with SAPA (compare id.). Indeed, the Hearing Examiners' admission of posthearing evidence into the record would itself have been a violation of SAPA (see State Administrative Procedure Act § 306 [1], [3]; 16 NYCRR 1000.12 [a] [9]; Matter of Alvarado v State of N.Y., Dept. of State, Div. of State Athletic Commn., 110 AD2d 583, 584-585 [1985]).
Petitioners next contend that the Siting Board's determination was not based on substantial evidence in the record, as they claim that Bluestone's proffered data underestimated takings of endangered golden eagles and that the project as designed will therefore violate state laws protecting endangered species. Petitioners further claim that Bluestone's reliance upon supposedly unverified census data was insufficient to support the Siting Board's finding that there are no environmental justice areas within the impact study area. Substantial evidence consists of "such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact, and is less than a preponderance of the evidence, overwhelming evidence or evidence beyond a reasonable doubt. The standard demands only that a given inference is reasonable and plausible, not necessarily the most probable" (Matter of Ridge Rd. Fire Dist. v Schiano, 16 NY3d 494, 499 [2011] [internal quotation marks and citations omitted]; see Koch v Dyson, 85 AD2d 346, 364 [1982]). "Although there may be substantial evidence on both sides of an issue disputed before an administrative agency, under the substantial evidence standard, reviewing courts do not weigh the conflicting evidence or decide if they find the evidence convincing; instead, when a rational basis for the conclusion adopted by the agency is found, the judicial function is exhausted" (Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 169 AD3d 1334, 1335 [2019] [internal quotation marks, brackets and citations omitted], appeal dismissed and lv denied 33 NY3d 1053 [*9][2019]; Matter of Watson v New York State Justice Ctr. for the Protection of People with Special Needs, 152 AD3d 1025, 1026-1027 [2017]).
As to the potential impact on golden eagles, there is no dispute that, but for the Public Service Law article 10 process, the project would be subject to the substantive requirements for an incidental taking permit as set forth in ECL 11-0535 and 6 NYCRR 182.11. If a permit had been required, it would be granted by DEC, which, as a party to the administrative proceeding below, specifically determined that the project met the regulatory requirements for such a permit. In support of its application, Bluestone set forth a number of documents pertaining to the impact of the project on golden eagles, including an avian risk assessment prepared by Western EcoSystems Technology, Inc., which concluded that impacts to golden eagles from the project development are "expected to be minimal due to the limited amount of suitable habitat" in the project area and that the risk posed to golden eagles would be low. This conclusion was predicated upon the level of golden eagle use observed and the seasonality of that use, the eagles' flight paths and height and the lack of known golden eagle nests in New York. A net conservation benefit plan was also submitted by Bluestone, which confirmed that no golden eagles have been recorded nesting in New York since 1979 and ultimately concluded that golden eagle fatalities could occur on occasion, "conservatively estimated at one eagle for every 10 years the [p]roject is operational," totaling the taking of approximately three golden eagles over the expected 30-year life of the project. This estimate was deemed reasonable by the direct testimony of two wildlife biologists employed by DEC, who opined that the takings estimate of one golden eagle per decade was reasonable. The experts went on to offer their opinion that the project as proposed, when considered alongside the draft certificate conditions, adequately avoided and minimized impacts to golden eagles.
Petitioners also submitted evidence on the potential impact to golden eagles. This included the testimony of Salo, director of the Franklin Mountain Hawk Watch located near the City of Oneonta, Otsego County, who acknowledged that the species has not nested in New York in several decades. However, Salo expressed his belief that the project area "contains some of the best [g]olden [e]agle habitat in New York." Salo went on to challenge the takings estimate produced by Bluestone, arguing that the method employed to calculate that number lacked a scientific foundation and that the Bayesian risk model, which produced a much higher takings estimate, was more accurate.[FN6] Petitioners also offered the testimony of a senior research wildlife biologist and executive director of Conservation Science Global, Inc., who concluded that golden eagles use the project area for, among other things, hunting and perching, rather than merely a [*10]migratory passageway.
To be sure, petitioners offered voluminous evidence on the golden eagle population in New York and the golden eagles' potential interactions with the project site area, some of which contradicted that offered by Bluestone in support of its application. Petitioners' evidence on this issue, offered by seasoned local bird watchers and scientists, may be seen as persuasive. However, "[t]he task of weighing conflicting evidence . . . is properly left to the Siting Board" (Koch v Dyson, 85 AD2d at 373). The record reveals that the Siting Board undertook this task and indeed credited some of petitioners' concerns, but ultimately assigned greater weight to the testimony and opinion provided by DEC and its experts and concluded that the certificate conditions would minimize any impact on the golden eagle population. This expert testimony and agency assessment, alongside the factual data included in the avian risk assessment prepared by a private consultant, constitute substantial evidence (compare Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd, 79 NY2d 373, 384 [1992]). "Moreover, in an area of agency discretion such as this, where [DEC's] technical expertise plays so large a role," its judgment is particularly persuasive (Matter of City of New York v Larocca, 97 AD2d 666, 667 [1983]). That petitioners may have offered conflicting evidence does not change this analysis, as this Court's function on review is limited to determining whether the Siting Board's decision was supported by substantial evidence, which we find here (see Matter of Citizens for Hudson Val. v New York State Bd. on Elec. Generation Siting & Envt., 281 AD2d 89, 98-99 [2001]; Koch v Dyson, 85 AD2d at 364-373).[FN7]
As to the Siting Board's assessment of whether the project will result in significant and adverse disproportionate environmental impacts in any environmental justice areas, there was indeed evidence in the record supporting the Siting Board's conclusion that none would be impacted — namely, the Geographic Information System (hereinafter GIS) data available on DEC's website. Petitioners' contention on this point is limited to their assertion that this evidence was inadequate or unreliable. Indeed, Bluestone carried the burden of establishing whether the impact study area contained any environmental justice areas and had to demonstrate as much using "reliable U.S. Census data or other generally accepted and reasonably available demographic data" (6 NYCRR 487.5 [b] [emphasis added]). To be sure, DEC's website cautions against using the GIS data without verification by an independent professional. Nonetheless, as provided by DEC — the agency that oversees the assessment of environmental justice areas — the data utilized by Bluestone is no doubt generally accepted and, given its public availability on the Internet, reasonably available. Furthermore, as a party to the administrative proceeding, DEC did not object to Bluestone's use [*11]of its GIS data. Again, considering DEC's technical expertise in this area, a determination on which would be subject to its discretion apart from this Public Service Law article 10 proceeding, its apparent acquiescence to Bluestone's reliance on this data should be given particular weight (see Matter of City of New York v Larocca, 97 AD2d at 667). Because this data was cited in the record and is otherwise unchallenged, it is sufficient to support the Siting Board's conclusion that no environmental justice areas were present in the impact study area (Koch v Dyson, 85 AD2d at 373; compare Matter of Dodson v Planning Bd. of Town of Highlands, 163 AD2d 804, 807 [1990]).
Petitioners next contend that Bluestone's public involvement activities were ineffective and failed to ensure communication with the public inasmuch as it rejected DPS's recommendation to expand its definition of adjacent landowners, omitted adjacent landowners on its stakeholders list in the initial stages of the proceeding and failed to diligently file PIP meeting logs. Public Service Law article 10 requires that each decision and opinion of the Siting Board be made "pursuant to a process that afford[s] meaningful involvement of citizens affected by the facility regardless of age, race, color, national origin and income" (Public Service Law § 170 [2] [f]). This includes providing opportunities for citizen involvement that "encourage consultation with the public early in the pre-application and application processes" with the goal of "facilitat[ing] communication between the applicant and interested or affected persons" (Public Service Law § 163 [3]). Ultimately, "[t]he process shall foster the active involvement of the interested or affected persons" (Public Service Law § 163 [3]). Notably, at the outset of the process, an applicant must submit a proposed PIP to DPS for its review indicating the steps it will take to inform and engage the local community and general public (see 16 NYCRR 1000.4 [d]). DPS then provides written comments on the adequacy of the PIP, and the applicant, when submitting the final PIP, may either incorporate DPS's recommendation "or provide a written explanation as to why the [a]pplicant is not incorporating the DPS recommendation" (16 NYCRR 1000.4 [e]).
To the extent that petitioners have standing based on the above provisions, their claim lacks merit. In its order on rehearing, the Siting Board reviewed each of petitioners' present arguments regarding public involvement and found that "[t]he record demonstrates that numerous opportunities for meaningful public participation were provided throughout this proceeding." While recognizing that Bluestone declined to accept DPS's recommendation regarding direct communication with certain stakeholders, the Siting Board noted that it did not interpret that recommendation as a DPS claim of legal error on Bluestone's part. Moreover, the Siting Board highlighted that petitioners made no showing that the [*12]alleged procedural infirmaries resulted in material prejudice to any party.
The record is replete with documentation and other evidence that speaks to public involvement in this proceeding, which is in part described in the DPS staff testimony. While true that Bluestone declined to adopt DPS's recommendation as to the definition of adjacent landowners, it did not run afoul of the regulations by failing to incorporate this change. In fact, its provision of an explanation as to why it chose not to adopt the recommendation was in accordance with the regulatory requirements (see 16 NYCRR 1000.4 [e]). Further, although DPS staff highlighted Bluestone's initial omission of adjacent landowners on its stakeholders list and its failure to consistently file PIP meeting logs in a timely manner, DPS made no indication that these shortcomings undermined meaningful public involvement in the proceeding. Although it is undeniable that DPS staff described these instances as areas in which Bluestone could have improved its public outreach, DPS ultimately opined that Bluestone was mostly successful in this regard. Inasmuch as the record reflects consistent and meaningful public involvement in the underlying proceeding and the testimony of DPS staff indicates that each alleged procedural defect was either consistent with the applicable regulations and/or ultimately cured, petitioners' claims on this point are unavailing.[FN8] We have examined any further claims by petitioners and find them to be without merit.
Garry, P.J., Aarons, Reynolds Fitzgerald and Colangelo, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.



Footnotes

Footnote 1: This Court takes judicial notice that, although Local Law No. 4 was date stamped received by the Department of State on December 13, 2019, it was not filed until December 16, 2019. (see New York State Department of State, https://locallaws.dos.
ny.gov/sites/default/files/drop_laws_here/ECMMDIS_appid_DOS20191219060051/Content/09021343802a299a.pdf). Thus, Local Law No. 4 did not even take effect until December 16, 2019, the day the Siting Board met (see Municipal Home Rule Law § 27 [3]).

Footnote 2: In February 2021, petitioners moved for a preliminary injunction, which this Court denied (2021 NY Slip Op 62913[U]).

Footnote 3: We note that the Siting Board and Bluestone are the only respondents who have filed briefs in this proceeding.

Footnote 4: Local Law No. 4 was not referred to by name, but rather as "the later law."

Footnote 5: Several of these challenges involve motions by nonparty Heather D. DeHaan. As petitioners did not join her motions, they were not aggrieved by the results and therefore lack standing to make such challenges (see Public Service Law § 170 [1]; see generally Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 773 [1991]).

Footnote 6: DEC experts explained that DEC does not use the so-called Bayesian risk model employed by the US Fish and Wildlife Services to calculate the taking of eagles, as it had found that this method did not accurately predict takings based on its experience in New York.

Footnote 7: Petitioners' further contention that the Siting Board erred by refusing to consider petitioners' motion to remove confidential treatment of certain evidence regarding eagle takings was not raised in the amended petition, and, therefore, it is not properly before this Court (see Matter of Allrich v Regents Review Comm. Off. of Legal Servs., 179 AD3d 1156, 1158 [2020]; Matter of Sanders v New York State & Local Employees' Retirement Sys., 126 AD3d 1281, 1282 [2015]).

Footnote 8: Petitioners further contend that the Siting Board's cumulative actions in allegedly violating SAPA, rendering a decision that was not supported by substantial evidence in the record and failing to provide for meaningful public involvement amounted to a procedural due process violation. As each of these underlying arguments is unavailing, petitioners' due process claim must fail.